Jason QUINN, Plaintiff,

v.

CITY OF KANSAS CITY, KANSAS,
et al., Defendants.

No. Civ.A. 98–2236–KHV.

United States District Court,
D. Kansas.

Aug. 19, 1999.

City, Kansas, the Unified Government of Wyandotte County/Kansas City, Kansas, Marcella Tarbox and Jeffrey Ring; as well as *Defendant Hooks' Motion To Join In The Motion Of Other Defendants To Set Aside And Rescind Settlement Agreement, To Impose Sanctions, And To Temporarily Restrain Plaintiff And His Attorneys From Spending Any Settlement Proceeds* (Doc. # 83) filed May 28, 1999 and *Motion To Join In Reply Brief* (Doc. # 95) filed July 26, 1999 by defendant Dwayne C. Hooks.[1] Defendants argue that the Court should rescind the settlement agreement, reopen the case and impose various sanctions on plaintiff based upon their discovery that plaintiff gave false testimony at his deposition. For the reasons stated below, defendants' motions must be sustained in part and denied in part.

### Facts

Plaintiff brings suit against defendants under 42 U.S.C. §§ 1983 and 1985, alleging that defendants violated his civil rights during an incident on May 29, 1997. Defendants arrested plaintiff and plaintiff sustained injuries, allegedly as the result of excessive force which defendants used. Plaintiff challenges both his arrest and the amount of force used by defendants. On December 17 and 18, 1998, defendants deposed plaintiff. During this deposition, plaintiff denied any knowledge that DaRon Lane sold illegal drugs, denied any involvement in Lane's drug-related activities, denied knowledge that Lane's drug buyers rented vehicles for Lane, including the vehicle in which plaintiff was riding on May 29, 1997, denied knowledge that Lane carried a gun, and denied ever seeing Lane, Lance Carrell or Brandon Pickens (other occupants in the vehicle) carrying firearms. Plaintiff also asserted that the beating which he allegedly received from Hooks caused permanent injuries including a deviated septum and a deformity in the orbital floor of his left eye socket.

Catherine A. Donnelly, Vleisides, Donnelly & O'Leary, John W. Kurtz, Hubbard Kurtz Taylor Maloney, L.L.P., Kansas City, MO, for Plaintiff.

Douglas M. Greenwald, Daniel B. Denk, McAnany, Van Cleave & phillips. P.A., Henry E. Couchman, Jr., Stephen G. Mirakian, Cheryl A. Pilate, Wyrsch Hobbs Mirakian & Lee, P.C., Mark J. Sachse, Kansas City, KS, for Defendants.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

This matter comes before the Court on *Defendants' Motion To Set Aside And Rescind Settlement Agreement, To Impose Sanctions, And To Temporarily Restrain Plaintiff And His Attorneys From Spending Any Settlement Proceeds* (Doc. # 82) filed May 28, 1999 by the City of Kansas

---

1. Defendants Gregory Hotujec and Larry Roland do not participate in the current motions to set aside the settlement.

Between February and April of 1999, the parties entered settlement agreements under which plaintiff dismissed all claims with prejudice in exchange for defendants' payment of $100,000. The parties entered two agreements—one which dismissed all claims against Tarbox and Ring, and one which dismissed all claims against Hooks, Hotujec, the Unified Government and the City of Kansas City. The parties executed the Tarbox/Ring agreement and the Court entered an order which dismissed plaintiff's claims against Tarbox and Ring with prejudice. *See Order Of Dismissal As To Defendants Ring And Tarbox* (Doc. # 75). Not all defendants executed the second agreement, but defendants nonetheless conveyed $100,000 to plaintiff.[2]

On May 5, 1999, after receiving $100,000 in settlement proceeds, plaintiff testified before this Court in a related criminal case against Hooks. In that case, which charged Hooks with criminally violating plaintiff's civil rights, plaintiff admitted that he testified falsely during portions of his deposition.

Defendants provide the following relevant differences between plaintiff's deposition testimony and his testimony in the criminal case:

## A. DaRon Lane's Drug Sales

### 1. Deposition Testimony:

Q. Did you ever know DaRon Lane to be involved in drug deals?

A. I knew he sold marijuana.

&ast;&ast;&ast;&ast;&ast;&ast;

Q. Had you ever been present during any of Mr. Lane's drug transactions?

A. No.

&ast;&ast;&ast;&ast;&ast;&ast;

Q. Do you know what kind of drugs Mr. Lane sold?

A. Marijuana.

---

**2.** Defendants concede that the lack of signatures by certain defendants does not invalidate the agreement.

Q. Did he sell any other drugs, to your knowledge?

A. Not to my knowledge.

*Brief In Support Of Defendants' Motion To Set Aside And Rescind Settlement Agreement, To Impose Sanctions, And To Temporarily Restrain Plaintiff And His Attorneys From Spending Any Settlement Proceeds* (Doc. # 84), Ex. A. (Quinn deposition) at 159, 282–84.

### 2. Criminal Trial Testimony:

Q. Okay, when you gave a deposition in the civil case related to this incident, were you asked whether your friend, Deron Lane, was a drug dealer?[3]

A. Yes.

Q. What did you say?

A. I told them that he sold marijuana.

Q. Were you asked whether he sold drugs other than marijuana?

A. Yes.

Q. What did you say?

A. No.

Q. Was that true?

A. No.

&ast;&ast;&ast;&ast;&ast;&ast;

Q. Page 283. "Question: Had you ever been present during any of Mr. Lane's drug transactions?" And your answer was "No." Correct?

A. Correct.

Q. Now, you had been sworn to tell the truth, correct?

A. Correct.

&ast;&ast;&ast;&ast;&ast;&ast;

Q. And yet you chose to not tell the truth, correct?

A. Correct.

---

**3.** The deposition of plaintiff's criminal trial testimony spells Lane's first name as Deron, while his deposition and the parties spell the name DaRon. The Court adopts the spelling used by the parties.

Q. Now, that was an intentional decision on your part, wasn't it?

A. Yes.

\* \* \* \* \* \*

Q. Now, you had been with Mr. Lane on repeated occasions when he was engaging in narcotics trafficking activities; isn't that correct?

A. Yes.

*Brief In Support Of Defendants' Motion To Set Aside And Rescind Settlement Agreement, To Impose Sanction, And To Temporarily Restrain Plaintiff And His Attorneys From Spending Any Settlement Proceeds* (Doc. # 84), Ex. E (Quinn testimony at criminal trial) at 37–38, 83–85.

## B. DaRon Lane's Use of Cars Rented By His Drug Customers; Carrying of Firearms by Lane, Carrell, and Pickens

### 1. Deposition Testimony:

Q. ... Did DaRon normally drive a particular vehicle?

A. Yes. He had a car. I believe it was in the shop at that time.

Q. Had you seen him in other cars before?

A. Yes.

Q. Do you have any knowledge as to how he obtained those vehicles?

A. No.

\* \* \* \* \* \*

Q. Did you ever know Lance Carrell to carry a weapon?

A. No.

Q. How about DaRon Lane?

A. No.

\* \* \* \* \* \*

Q. ˙ Do you know whether Lance Carrell has ever been arrested for possession—excuse me, for carrying a pistol?

A. I don't know.

\* \* \* \* \* \*

Q. Did you know any of them to carry a weapon?

A. Yes.

Q. Which one of the individuals did you know to carry a weapon?

A. Previously, DaRon used to carry guns until he got caught. And he stopped. So—little Brandon, I didn't know him that well. I knew he had been in a little trouble, but we weren't running buddies. That was DaRon's cousin. And I didn't know Lance to carry a gun.

\* \* \* \* \* \*

Q. Did you ever see DaRon Lane's gun?

A. No.

Q. You knew he carried a gun?

A. He did some—at some point in time, yes.

Q. And you knew him to carry a gun; is that correct?

A. Then, yes.

Q. But you never saw it?

A. Correct.

\* \* \* \* \* \*

Q. You stated during questioning by Mr. Cassidy that you never saw DaRon Lane's gun; is that correct?

A. Correct.

Q. Yet you knew that he carried one at times; is that correct?

A. I knew he carried a gun. He—I was in college when he got caught with a gun. So I wouldn't have been with him to see him carry a gun.

Doc. # 84, Ex. A at 159, 280, 352, 523–24, 535.

### 2. Criminal Trial Testimony:

Q. ... Now, Mr. Quinn, I want to talk to you about a couple of other aspects of your testimony today. You indicated on your direct examination that all of the individuals who were with you, Mr. Lane, Mr. Pickens, Mr. Carrell, were all known to carry firearms at various times, correct?

A. Correct.

Q. And you had seen each of those individuals on repeated occasions carrying firearms, correct?

A. Sometimes, yes.

Q. And Mr. Lane very often carried a weapon with him when he was engaged in his crack cocaine dealing activities, correct?

A. Sometimes.

Q. Okay. And he generally carried on those crack cocaine dealing activities from a rental car, correct?

A. Correct.

Q. And those cars would be rented by persons who were drug customers of his, correct?

A. Correct.

Q. And that would include Mr. Pickens and Mr. Carrell as people that you had seen on various occasions with firearms, correct?

A. I haven't seen Lance with one, but I know he got caught with one. And Brandon, I have seen him a few times with one.

 * * * * * *

Q. ... At line 19 of that deposition, you were asked the question: "Did you ever see Deron Lane's gun," correct?

A. Correct.

Q. And your answer was no, correct?

A. Correct.

Q. Indicating that you had never seen that gun, correct?

A. Correct.

Q. That answer was not true, was it?

A. I mean, what gun?

Q. The gun you described for the jury ... that you had, in fact, seen.

A. That is incorrect.

Q. This answer is incorrect?

A. Yes.

Q. And you knew it was incorrect at the time that you gave it, didn't you?

A. I mean, I should have said yes.

 * * * * * *

Q. Okay, so you understood the nature of the question but did not tell the truth in the answer; is that correct?

A. Correct.

 * * * * * *

Q. ... Now, you indicated shortly before we broke for lunch that you were aware that Deron Lane obtained rental vehicles from crack cocaine customers of his, correct?

A. Some of them, yes.

Q. On Page 352 of your deposition, sir, if you could turn to that, at line 15, you were asked the question: "Do you have any knowledge as to how he obtained those vehicles?" Is that what it says?

A. Yes.

 * * * * * *

Q. And you answered no, correct?

A. Correct.

Q. Now, in fact, Mr. Quinn, you know—you have testified here today that you knew that on occasion Deron Lane's crack cocaine customers would rent vehicles for him, correct?

A. Right.

 * * * * * *

Q. And so your answer on Page 352 to the question at line 16 was simply not correct, was it?

A. No.

Q. And, again, you understood the question that was being asked concerning how he got other cars, correct?

A. Yes.

Q. And, again, you made a decision not to tell the truth about what you knew about how Mr. Lane obtained any of those other vehicles, correct?

A. I mean, I had already said that I didn't know he sold crack, so I couldn't turn around and say he got the cars from crack customers.

Q. Exactly. You had told one lie and you had to·keep telling lies in order to cover up for the first one that you told; isn't that right?

A. Pertaining to that, yes.

Doc. # 84, Ex. D at 114–15, 120–25.

## C. Plaintiff's Injuries To His Eye and Nose

### 1. Deposition Testimony:

Q. What injury do you claim resulted to your eye from the gouging that you have just described?

A. Well, I seen double for almost two months. I had a fractured orbit. I have a cyst on my eye, on my left eye, and a left deformity in my eye, like the plate. I can't remember the exact term for it.

Q. But some doctor has told you that you had a fractured left orbital socket?

A. Yes.

\* \* \* \* \* \*

Q. ... You also said, I think, that you had some—or started to tell me and I interrupted you, but did you have any injury to your nose?

A. Yes.

Q. Tell me about the injury to your nose.

A. I had at least one fracture in my nose and a deviated septum.

Q. Had you ever had a fracture to your nose or a deviated septum, to your knowledge, before May 29, 1997?

A. No.

\* \* \* \* \* \*

Q. What about the deviated septum; has anybody told you, any doctor told you what caused the deviated septum?

A. Well, the blow to the nose. I mean, I know, because I didn't have—have it before.

Q. That what I was going to ask you. Had you ever been examined—let me just ask it this way: Has any doctor ever told you or have you ever seen any doctor's report—

A. Uh-huh.

Q.—a statement by a doctor saying that you suffered a deviated septum due to a blow to the nose on May 29th?

A. Exactly, no, I haven't seen nothing like—anything like that.

Q. If I understand you correctly, you believe you were hit in the nose on May 29th, and you believe that's what caused you to have a deviated septum?

A. Correct.

\* \* \* \* \* \*

Q. Did anyone ever tell you that the deviated septum resulted from the trauma that you state was received on that day?

A. Specifically, I don't think so. But, I mean, that's the only time I ever hit my nose. And I had blood clogged up in my nose, old blood. So that gave me the impression that it came from the incident.

Q. Did anyone ever mention to you that there might be other causes for a deviated septum?

A. A blunt hit to the nose, that's what causes them. I remember one of the doctors saying that. I mean, you have to get hit in your nose to have one. I'm pretty sure that's what they told me.

Doc. # 84, Ex. A at 82–83, 109–10, 140, 359–60.

### 2. Criminal Trial Testimony:

Q. And its your understanding that an injury that is developmental in nature is something that you have had for a long time?

A. Yes.

**1090**

Q. And you believe from your conversations with the doctors that the deviated septum was something you may have even had since birth; is that correct?

A. Correct.

* * * * * *

Q. Did you ever tell these lawyers that you didn't really understand the nature of the question and you weren't sure what a deviated septum was? Did you ever tell them that?

A. I'm not saying I didn't understand the nature of the question.

* * * * * *

Q. ... [W]hen you were deposed and asked about the nature of your injuries that you claim to be permanent and progressive and related to this trauma, you claimed a deviated septum related to this trauma; isn't that right?

A. Yes I did.

Q. And that is not the case, is it?

A. No, it's not.

Q. So that was a lie, wasn't it?

A. It was a mistake.

Q. Another mistake. So you didn't say, well, I don't really know, you will have to talk to the doctor who treated me. You didn't say that in the deposition on Page 140, did you?

A. No.

* * * * * *

Q. And so you're now saying that the answer that you gave on that date under oath was wrong, unintentionally so but, nonetheless, incorrect, right?

A. Right.

Q. It was based on a mistake on your part?

A. Correct.

Q. It seemed to you—as I understand your testimony, it seemed to you that that is what you had been told your injuries were, and so that is why you testified as you did, correct?

A. Correct.

* * * * * *

Q. And you have claimed at various time a deformity of your orbital floor as a result of this injury, correct?

A. I have never said that.

Q. Didn't you say that in your deposition, that that was one of the permanent progressive injuries you suffered as a result of the events of May 29th, that you had a deformity in your orbital floor?

A. No. They told me—the doctor told me that that was probably there just because it was there.

Q. I understand that the doctor has told you that it's developmental. I'm not interested in at this point what the doctor told you. I am interested in what you said in the deposition, and that was that the deformity in your left orbital floor was as a result of the incident of May 29th?

A. If I said it, then that is wrong.

* * * * * *

Q. And you were once again wrong, correct?

A. Correct.

Q. Was there any question in your mind about the nature of the question that you were asked? I mean, what they were expecting you to tell them?

A. No. I just—

Q. They were asking you to describe for them the injuries that you had suffered, correct?

A. Yes.

Q. Would it be fair to state that you, in that answer, overstated those injuries?

A. I shouldn't have said that about the deformity. That should have been—that shouldn't have been in there.

Doc. # 84, Ex. D at 127–28, 130–33, 215–17.

### Analysis

■ Defendants argue that plaintiff's false testimony provides grounds for rescinding the settlement agreement and reopening the case by setting aside the Court's order of dismissal of some defendants. *See Order Of Dismissal As To Defendants Ring And Tarbox* (Doc. # 75). Defendants argue that plaintiff induced them to enter into the settlement agreement through false deposition testimony and that the agreement is therefore voidable.[4] Fraudulent conduct provides sufficient grounds for rescinding a settlement agreement. *Callen v. Pennsylvania R. Co.*, 332 U.S. 625, 630, 68 S.Ct. 296, 92 L.Ed. 242 (1948); *Koch v. Koch Indus., Inc.*, 969 F.Supp. 1460, 1489 (D.Kan.1997) (citing *Connor v. Hammer*, 201 Kan. 22, 24, 439 P.2d 116, 118–19 (1968); *Lewis v. Gilbert*, 14 Kan.App.2d 201, 203, 785 P.2d 1367, 1368 (1990)). Likewise Fed.R.Civ.P. 60(b)(3) sets forth fraud as a basis for relieving a party of any final judgment or order. *See id.*

■ In Kansas, a claim of actual or affirmative fraud is defined as: (1) "an untrue statement of a material fact;" (2) "known to be untrue by the person making it;" (3) "made with intent to deceive or recklessly made with disregard for its truthfulness;" and (4) the alleging party "justifiably relies upon the statement and acts to his injury." *Slaymaker v. Westgate State Bank*, 241 Kan. 525, 531, 739 P.2d 444, 450 (1987) (citation omitted). "A fact is material if it is one to which a reasonable person would attach importance in determining his choice of action in the transaction involved." *Timi v. Prescott State Bank*, 220 Kan. 377, 389, 553 P.2d 315, 325 (1976) (citation omitted). In determining reliance, the Court must make both a subjective and objective inquiry— whether defendants actually relied upon plaintiff's false statements and (2) whether

this reliance was " 'reasonable, justifiable, and detrimental.' " *Slaymaker*, 241 Kan. at 531, 739 P.2d at 450 (quoting *Hutchinson Travel Agency, Inc. v. McGregor*, 10 Kan. App.2d 461, 464, 701 P.2d 977, 980, *rev. denied*, 238 Kan. 877 (1985)); *Kelley Metal Trading Co. v. Al–Jon/United, Inc.*, 835 F.Supp. 1339, 1341 (D.Kan.1993).

■ Because the Court has never entered final judgment in the case, it construes defendants' motion as one against enforcing the settlement. The Court has discretion to either enforce or reject a settlement agreement entered into by the parties while the litigation is pending. *United States v. Hardage*, 982 F.2d 1491, 1495 (10th Cir.1993).

■ Defendants argue that plaintiff committed fraud when he lied in his deposition, which influenced defendants in entering the settlement agreement. Plaintiff argues that his testimony and statements as a whole were not false, because he elsewhere conceded that DaRon Lane sold drugs and drove cars rented by customers, and that Lane, Carrell and Pickens carried weapons. Plaintiff apparently reasons that the true statements somehow cure the false ones. Regardless of plaintiff's true statements, however, the statements which defendants now challenge were obviously untrue.

Plaintiff also argues that testimony regarding his injuries was not false because he was simply confused about complex medical issues. In support of this argument, plaintiff notes that he stated that his deviated septum was a "mental injury" when he meant "developmental injury." This evidence regards the deviated septum and does not address the fact that plaintiff's testimony regarding the deformity on the orbital floor of his left eye was intentionally false. Plaintiff admitted that before May 29, 1997, doctors told him that this deformity was preexisting. Plaintiff

---

4. If the contract is voidable, defendants can rescind it even though they have already performed their obligations under it. *See Bank*

*of Topeka v. Majestic Fire Ins. Co.*, 119 Kan. 689, 240 P. 954, 955 (1925).

admitted that his deposition testimony was therefore incorrect in stating that the deformity resulted from the incident on May 29, 1997. Moreover, while plaintiff's evidence regarding the deviated septum shows that plaintiff confused the proper terminology, it does not show that his testimony was merely mistaken; plaintiff understood what the doctors meant, even if he did not use the correct terminology. Plaintiff's testimony regarding his deviated septum is more difficult to analyze than his other misstatements, however, because plaintiff's criminal trial testimony does not concede that he provided false information; plaintiff merely stated that he was mistaken. The Court finds, however, that plaintiff intentionally lied about his deviated septum in his deposition. Upon reviewing plaintiff's deposition testimony and criminal trial testimony, the evidence is clear that before his deposition, doctors informed plaintiff that his deviated septum was developmental and therefore not related to the incident on May 29, 1997. Defendants specifically asked whether any doctors had told plaintiff that there might be other causes for his deviated septum, but plaintiff did not mention prior discussions in which doctors informed him the condition was developmental. *See* Doc. # 84, Ex. A at 359–60. Instead, plaintiff asserted that doctors told him that his injuries resulted from sharp blows, suggesting that they resulted from the incident on May 29, 1997. At the criminal trial, plaintiff admitted that he knew that his deviated septum did not result from the incident on May 29, 1997. Plaintiff's deposition testimony was not merely mistaken; it was intentionally deceptive.

Plaintiff argues that his misstatements were immaterial because defendants had so much evidence which disagreed with his false testimony. Plaintiff's argument misses the mark. Even with the contrary evidence which defendants had, plaintiff's false testimony was clearly material to defendants' decision to settle. While it is true that defendants had contrary evidence and surely doubted plaintiff's testimony, the issue is not whether defendants believed plaintiff. The issue is whether defendants attached importance to the fact that a jury, knowing that plaintiff was sworn to tell the truth, could believe plaintiff's false testimony. Plaintiff contends that because defendants had so much contrary evidence, defendants could not have attached importance on his lies. The Court reaches the exact opposite conclusion—plaintiff's false testimony became all the more important because it disagreed with defendants' evidence. Defendants relied upon plaintiff's testimony in assessing the risk of proceeding to trial and assigning value to a settlement, because defendants could reasonably assume that plaintiff's trial testimony would be the same as his deposition testimony. Plaintiff apparently assumes that no jury would possibly believe his false testimony. The Court cannot agree with such a conclusory assumption, and defendants reasonably considered the possibility that a jury would believe plaintiff's false testimony. Without plaintiff's false testimony, defendants' evidence (that DaRon Lane dealt drugs and drove cars rented by his drug clients, and that Lane, Carrell and Pickens carried guns) would be uncontroverted. As a result, defendants' argument that plaintiff and his friends were up to no good on the date in question became that much stronger, helping defendants show that they had probable cause to stop the vehicle and reason to believe that plaintiff could have a weapon. If plaintiff had not testified falsely, defendants would have had less incentive to settle the case and less risk of liability from their perspective. Regardless whether defendants believed plaintiff's testimony, the possibility that a *jury* would believe plaintiff forced defendants to attach reasonable importance to his false testimony in deciding whether to settle the case. Plaintiff's misrepresentations were therefore material. *See Timi*, 220 Kan. at 389, 553 P.2d at 325.

Plaintiff also argues that his misstatements were not material because defendants settled the case based on the horrific conduct records of defendants Hooks and

Hotujec and not because of plaintiff's testimony. While the Court agrees that the evidence regarding Hooks and Hotujec is egregious and certainly would suggest the wisdom of settlement, the Court is unable to accept plaintiff's broad statement that defendants *only* looked at this evidence and ignored plaintiff's false testimony. Rather, defendants state that they placed weight on plaintiff's false testimony, and the Court agrees they reasonably did so. Defendants perhaps focused more heavily on the dangers presented by evidence regarding Hooks and Hotujec, but in all likelihood defendants considered *all* existing evidence in deciding the appropriate course of action. Prudent and reasonable counsel would consider all evidence that a jury would hear. The prior conduct of Hooks and Hotujec, on its own, would not automatically establish that defendants were liable to plaintiff. Rather, plaintiff needed to establish that defendants violated his civil rights on May 29, 1997. Plaintiff's testimony regarding drug dealing, car rentals and firearm use by companions were all relevant in determining whether defendants had probable cause to stop plaintiff and to consider him a potential safety risk as he was taken into custody. The Court finds that plaintiff's false statements were material to defendants' decision to settle the case for $100,000.

Plaintiff next argues that defendants neither subjectively or objectively relied upon his false testimony. First, plaintiff notes that defendants have never found plaintiff to be credible and have attacked his veracity whenever possible. As discussed above, this argument misses the point. The issue is not whether defendants *believed* plaintiff's testimony but whether defendants subjectively believed that a jury could accept it. Defendants assert that they had to consider plaintiff's testimony in their risk evaluation, showing that they subjectively relied upon plaintiff's false statements in deciding to settle.

Plaintiff argues that defendants could not have objectively relied upon his false testimony as the basis for settlement, because to do so would require defendants to ignore the evidence regarding Hooks and Hotujec. As noted above, the Court disagrees with plaintiff's apparent belief that defendants either considered the evidence regarding Hooks and Hotujec or plaintiff's false testimony, but could not have considered both. The Court fails to see how the two evidentiary issues are mutually exclusive. Defendants could reasonably rely on both issues in considering their potential risk and whether settlement was appropriate.

The Court finds that defendants' reliance on plaintiff's false testimony was objectively reasonable. Reasonable counsel could assume that a party's sworn deposition testimony would be substantially consistent with the party's testimony at trial. Defendants therefore reasonably believed that plaintiff's false testimony would be presented to the jury, countering some of defendants' evidence and weakening defendants' case.

■ In sum, defendants have established that plaintiff fraudulently induced defendants into the settlement agreement for $100,000. Plaintiff argues, however, that equity requires the Court to ignore his wrongdoing because defendants have also engaged in wrongdoing. Plaintiff asserts that defendants withheld information regarding Jeff Burton, a witness who provided substantial evidence regarding DaRon Lane's drug dealing in violation of their discovery duties under Fed.R.Civ.P. 26. Even assuming that defendants did not reveal discoverable evidence to plaintiff, the Court does not find that this wrongful conduct entitles plaintiff to retain his ill-gotten settlement proceeds. As plaintiff notes, the Court must balance the conduct of both parties and make its decision according to the "greater weight of all the equities." *Home Owners' Loan Corp. v. Oakson,* 161 Kan. 755, 766, 173 P.2d 257, 265 (1946). Quite simply, even if defendants acted wrongly, their conduct is the sort that this Court confronts every day. In no way does a discovery dispute equal or exceed plaintiff's decision to ignore his

oath and provide false testimony in his deposition. The judicial system cannot tolerate dishonest testimony. This case provides the rare circumstance where the lying party later admits that his testimony was dishonest. When the Court becomes aware of such clear-cut evidence of false testimony by a party, the Court must not turn a blind eye; it must remedy the situation to preserve the integrity of the judicial system. A party must respect his obligation to provide honest testimony. Otherwise the judicial system would cease to serve justice and instead would become a manipulated tool where the litigant who can create the best lie wins. Upon balancing the equities, defendants' wrongful conduct is not as egregious as plaintiff's, and therefore equity does not require the Court to enforce the settlement agreement. Plaintiff's conduct is wholly intolerable and the Court cannot award plaintiff for fraudulent conduct by allowing the settlement agreement to stand.

The Court finds that defendants are entitled to rescind the parties' settlement agreement due to plaintiff's fraud and the Court therefore refuses to enforce the settlement agreement. As a result, plaintiff must return all settlement proceeds which he has received.[5] Likewise, the Court vacates its order dismissing plaintiff's claims against Tarbox and Ring with prejudice. *See Order Of Dismissal As To Defendants Ring And Tarbox* (Doc. # 75).

**B. Sanctions**

 Defendants argue that the Court should dismiss plaintiff's claims as a sanction for his false deposition testimony. Defendants rely both upon the Court's inherent powers, see *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), and upon Fed.R.Civ.P. 11. In determining which sanctions should be imposed, the Court must consider the purposes to be served by the imposition of sanctions. In *White v. General Motors*

*Corp., Inc.*, 908 F.2d 675 (10th Cir.1990), the Tenth Circuit outlined those purposes as including (1) deterring future litigation abuse, (2) punishing present litigation abuse, (3) compensating victims of litigation abuse, and (4) streamlining court dockets and facilitating case management. *Id.* at 683. The primary goal of sanctions is to deter misconduct. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 398, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). In considering the imposition of sanctions, the Court must consider on a case-by-case basis whether a party's failure was substantially justified or whether other circumstances make the imposition of sanctions inappropriate. *In re Westinghouse Elec. Corp. Uranium Contracts Litig.*, 563 F.2d 992, 997 (10th Cir.1977) (*citing Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958)).

 Courts should restrict the imposition of a default judgment for failures to comply with orders to situations which are the result of willfulness, bad faith, or fault, rather than inability to comply. *M.E.N. Co. v. Control Fluidics, Inc.*, 834 F.2d 869, 872 (10th Cir.1987) (*quoting National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 640, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976)); *see also, Toma v. City of Weatherford*, 846 F.2d 58, 60 (10th Cir.1988). In this context, willful failure is "intentional failure as distinguished from involuntary noncompliance." *In re Standard Metals Corp.*, 817 F.2d 625, 628–29 (10th Cir.1987). Before entering default judgment as a discovery sanction, the Court must consider the following factors:

> (1) the degree of actual prejudice to the opposing party;
> (2) the amount of interference with the judicial process;
> (3) the culpability of the litigant;

---

**5.** Defendants' request for a temporary restraining order to prevent the distribution of these proceeds is therefore moot.

(4) whether the Court gave advance warning that dismissal of the action would be a likely sanction for noncompliance; and

(5) whether a lesser sanction would be effective.

*Ehrenhaus v. Reynolds,* 965 F.2d 916, 921 (10th Cir.1992). Dismissal of an action with prejudice or its equivalent should be used as "a weapon of last, rather than first, resort." *Meade v. Grubbs,* 841 F.2d 1512, 1520 n. 6 (10th Cir.1988); *Maggette v. Dalsheim,* 709 F.2d 800, 803 (2d Cir. 1983). Default judgment is usually appropriate only where a lesser sanction would not serve the interest of justice; it is clearly a severe sanction and it is reserved for extreme circumstances.

 Defendants have not been so prejudiced by plaintiff's conduct that dismissal of plaintiff's claims is required. Defendants do not show any prejudice which they suffered other than their decision to settle the case, a decision of which the Court has already relieved them. Plaintiff's false testimony has not prejudiced defendants' ability to present their case at trial. As plaintiff notes, defendants already had much evidence which contradicted plaintiff's false testimony. If anything, plaintiff's course of conduct has helped defendants more than it has hurt them, because plaintiff has lost much of his credibility.

Plaintiff's conduct has interfered with the judicial process, in that a settled case must now be reopened. The extent of this interference is unclear, however, because many of the other considerations which counseled settlement continue to exist. In addition, defendants do not show that discovery would need to be reopened, as the Court discusses below.

Plaintiff's culpability is high, because he made the intentional decision to provide false testimony. Plaintiff is wholly responsible for the sanctionable conduct. Plaintiff's false testimony, however, did not pertain directly to the main issues of the case; it was evidence that at best would allow a jury to infer that plaintiff was up to no good when the incident occurred. As discussed above, defendants already had significant evidence to help them create such an inference. In addition, defendants do not provide any suggestion that plaintiff was aware that dismissal was a possible sanction prior to providing false testimony, and the Court is not aware of any circumstances which would place plaintiff on notice of such a severe sanction. Finally, as the Court discusses below, lesser sanctions are effective in this case.

Considering all relevant factors, the Court finds that dismissal of plaintiff's claims is not an appropriate sanction. While plaintiff's conduct is reprehensible, all other factors counsel against dismissal. The Court therefore denies defendants' request to dismiss plaintiff's claims.

Defendants argue that the Court should limit plaintiff's claims for damages by prohibiting him from seeking damages for bodily and physical injuries incurred on May 29, 1997 and any alleged mental anguish or distress which resulted from these injuries. Defendants also argue that plaintiff's excessive force claim should be dismissed. Defendants provide no reason why this is an appropriate sanction. While plaintiff's false testimony originally tainted his damage and excessive force claims, defendants do not show how plaintiff's false testimony continues to taint these claims. Plaintiff removed any taint when he conceded that his deposition testimony was false. If anything, plaintiff's course of conduct has helped defendants by weakening his credibility. As noted above, the relevant factors suggest that dismissal of plaintiff's claims is inappropriate. The Court will not impose such an extreme sanction when it has already returned the parties to the status quo and lesser sanctions are effective to punish plaintiff.

Defendants next argue that the Court should award attorneys' fees to defendants for the entire action. Defendants cite no authority, however, which allows such an extreme monetary award. Defendants seek reimbursement for the entire action,

yet they cannot reasonably argue that plaintiff's action is wholly without merit. Defendants also argue that the Court should award costs and fees which they incurred as a result of plaintiff's false testimony, and the Court finds that this is an appropriate sanction. The Court has already ordered plaintiff to return the $100,000 settlement amount. Combining this penalty with the additional payment of costs and fees incurred as a result of the false testimony will be sufficient to deter future litigation abuse. Plaintiff has been forced to pay a stiff penalty for his lies and defendants do not show why any more severe sanction is required to prevent him from lying again. Payment of costs and the return of his settlement proceeds is also ample punishment for plaintiff's litigation abuse. Likewise, this sanction wholly compensates defendants for the losses caused by plaintiff's abuse. While payment of these costs and fees does not necessarily streamline court dockets, the Court finds that payment of costs and fees is the more appropriate sanction under the circumstances.

Plaintiff must therefore reimburse defendants the attorneys' fees and costs associated with plaintiff's tainted deposition testimony. *See Jones v. Clinton*, 36 F.Supp.2d 1118, 1132 (E.D.Ark.1999). These costs and fees include those incurred during the actual deposition, the cost of the transcribed testimony of plaintiff from the criminal trial, as well as any other reasonable fees and expenses which defendants incurred as a result of plaintiff's false deposition testimony. Defendants argue that the Court should award attorneys' fees for their time spent observing the criminal trial. Defendants provide no reason why the rest of the trial showed plaintiff's deposition testimony to be false. The Court will not award defense fees for sitting through the entire criminal trial when the only portion relevant to defendants' motion to vacate the settlement agreement was plaintiff's testimony, which occurred early in the case.

## C. Discovery

Defendants argue that the Court should reopen discovery to allow defendants to redepose plaintiff and depose any other witnesses who could attack plaintiff's veracity. The Court finds defendants' request to be unnecessary. The Court sees little point in redeposing plaintiff. At best, defendants would only need to get plaintiff's truthful testimony in those areas where plaintiff testified falsely in the original deposition. Plaintiff's testimony during the criminal trial achieved the same result, because plaintiff conceded his false testimony and admitted the true facts. In addition, the Court sees little need to depose additional persons about plaintiff's veracity, when he has admitted under oath that he lied in his deposition. Plaintiff's veracity is already shattered at best. The testimony of additional witnesses will carry much less weight that plaintiff's own admission that he has lied under oath. Because defendants provide no valid reason for reopening discovery, the Court refuses defendants' request.

## D. Conclusion

Based on its prior discussion, the Court rescinds the settlement agreement and orders plaintiff to repay the $100,000 settlement amount which he has received. The Court also stays all proceedings until plaintiff has paid those funds. Recognizing that plaintiff may need some time to repay them, the Court orders payment by **October 31, 1999.** It would be inequitable for the Court to allow plaintiff to proceed in his litigation while continuing to retain the ill-gotten proceeds of a voided settlement agreement. A party seeking rescission of a contract must return the benefits it has received as a precondition to an action for rescission. *See Webster v. Toland*, 148 Kan. 36, 79 P.2d 884, 888 (1938); *U.S. Cas. Co. v. Stanley*, 129 Kan. 713, 284 P. 371, 373 (1930). Likewise, the Court holds that plaintiff must return the benefits of the settlement before he can proceed with the settled claims against defen-

dants. *See generally id.; Thede v. Norfolk Southern Corp.,* 953 F.2d 1392, 1992 WL 14943 at *1 (10th Cir. Jan 29, 1992) (Table, Text available on Westlaw, No.1992 WL 14943). The Court will not force defendants to incur additional costs and expenses associated with the action until plaintiff returns the money which is rightfully theirs. If plaintiff fails to repay $100,000 by October 31, 1999, however, the Court will dismiss his action with prejudice.[6]

**IT IS THEREFORE ORDERED** that *Defendant Hooks' Motion To Join In The Motion Of Other Defendants To Set·Aside And Rescind Settlement Agreement, To Impose Sanctions, And To Temporarily Restrain Plaintiff And His Attorneys From Spending Any Settlement Proceeds* (Doc. # 83) filed May 28, 1999 by defendant Dwayne C. Hooks be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED** that the *Motion To Join In Reply Brief* (Doc. # 95) filed July 26, 1999 by defendant Dwayne C. Hooks be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED** that *Defendants' Motion To Set Aside And Rescind Settlement Agreement, To Impose Sanctions, And To Temporarily Restrain Plaintiff And His Attorneys From Spending Any Settlement Proceeds* (Doc. # 82) filed May 28, 1999 by the City of Kansas City, Kansas, the Unified Government of Wyandotte County/Kansas City, Kansas, Marcella Tarbox and Jeffrey Ring; be and hereby is **SUSTAINED IN PART.** The Court orders plaintiff to repay $100,000 to defendants by **October 31, 1999.** Until plaintiff pays that amount in full, all proceedings except those related to sanctions are stayed.

**IT IS FURTHER ORDERED** that plaintiff repay all attorneys' fees and expenses which defendants incurred as a result of plaintiff's false testimony in this case. The procedure set forth in D.Kan.

Rule 54.2 shall apply to this issue, except that the time deadline shall be as follows. On or before **September 7, 1999,** defendants shall file a fee application which itemizes all fees and costs for which they seek reimbursement. If the parties reach agreement regarding the fee request, they shall file an appropriate stipulation on or before September 14, 1999. If they cannot agree, defendants on or before **September 14, 1999** shall file the required statement of consultation and supporting memorandum. Plaintiff may respond on or before **September 21, 1999** and defendants may reply on or before **September 28, 1999.** A hearing to determine any unresolved issues with respect to their fee application is hereby set for **September 30, 1999 at 10:00 a.m.** In all other respects, defendants' motions are **DENIED.**

6. At a status conference on July 29, 1999, defendants informed the Court that they were willing to proceed with the settlement if the Court also addressed sanctions on account of

plaintiff's false deposition testimony. To that extent, they modified the relief which their motions request.