2008 UT 80

R & R INDUSTRIAL PARK, L.L.C.; AlumaTek, Inc.; and Repair Express, Inc., Plaintiffs, Appellees/Cross–Appellants,

v.

The UTAH PROPERTY AND CASUALTY INSURANCE GUARANTY ASSOCIATION, Defendant, Appellant/Cross–Appellee.

Nos. 20070107, 20070100, 20070131.

Supreme Court of Utah.

Nov. 21, 2008.

Andrew M. Morse, Richard A. Vazquez, Robert G. Gilchrist, Jeffrey D. Eisenberg, David A. Cutt, Salt Lake City, for plaintiffs.

Tim Dalton Dunn, Gerry B. Holman, Salt Lake City, for defendant.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 This case comes to us on appeal from summary judgment and an order invalidating a settlement agreement between the parties. We are presented with two questions in this case: (1) whether the district court correctly interpreted Utah Code sections 31A–28–201 to –222 (the Guaranty Act), and (2) whether the district court properly invalidated the parties' settlement agreement (the Settlement Agreement). We affirm the district court's interpretation of the Guaranty Act, but reverse its holding regarding the Settlement Agreement.

## BACKGROUND

¶ 2 In 1999, a fire occurred at the R & R Industrial Park, L.L.C. (R & R) property in Salt Lake City, destroying a significant portion thereof. At the time of the fire, AlumaTek, Inc., (AlumaTek) was leasing a portion of the property damaged by the fire, and CDR Enterprises (CDR) was occupying another portion of the property. The evidence indicated that material stored by CDR caused the fire.

¶ 3 At the time of the fire, CDR was insured by Reliance Insurance Company (Reliance) with a liability insurance policy of $1,000,000 per occurrence as well as an excess liability policy of $5,000,000. However, Reliance was liquidated on February 21,

1. No substantive changes have been made to the Guaranty Act since 2002; therefore we cite the newest version of the Act. *See* Utah Code Ann. §§ 31A–28–201 to 222 (2005 & Supp. 2008).

2002. Subsequently, the Utah Property and Casualty Insurance Guaranty Association (UPCIGA) assumed the role of CDR's insurer pursuant to its statutory obligation under Utah Code sections 31A–28–202, –207 (2005 and Supp. 2008).[1]

¶ 4 R & R collected $1,517,609.86 from its insurance carrier CNA. Of that amount, $1,343,382.86 was for its first-party property damage, and $174,227 was for lost rent. AlumaTek received $272,000 from its insurance carrier, St. Paul Insurance Company, for property damage.

## PROCEDURAL HISTORY

¶ 5 In November 2000, R & R filed suit against CDR for negligence and breach of contract. On January 11, 2001, AlumaTek filed its own action against CDR for negligence, claiming over $500,000 in property and inventory damages and $700,000 for losses stemming from interruption of business.

¶ 6 CDR turned its defense over to its insurance company, Reliance. Subsequently, Reliance was liquidated by order of the Commonwealth Court of Pennsylvania, and, pursuant to its duties, UPCIGA took over defense of the case.

### A. THE SETTLEMENT AGREEMENT

¶ 7 On February 21, 2003, R & R, AlumaTek, Repair Express[2], and UPCIGA attended a mediation. During the mediation, UPCIGA argued that it only had a maximum $300,000 obligation to R & R and AlumaTek respectively, as it only had to respond to "one covered claim per claimant" on behalf of Reliance. In addition, UPCIGA argued that it should not have to pay any sum because of the offset clause in Utah Code section 31A–28–213 (Supp.2008), which it argued requires the deduction from UPCIGA's obligation of any recovery from third-party insurers.

¶ 8 To resolve the issue, the parties agreed to file a declaratory action to determine UPCIGA's rights and obligations under the Guaranty Act in relation to the "one covered

2. Repair Express settled with UPCIGA and is no longer involved in this case.

claim per claimant" and the offset clause provisions of the statute. The Settlement Agreement was drafted and submitted to all parties on May 2, 2003, and was signed on May 21, 2003.

¶ 9 The relevant part of the Settlement Agreement reads as follows:

UPCIGA will pursue declaratory judgement [sic] action regarding its rights and obligations in this matter. More specifically, this declaratory judgment action will address, among other issues, UPCIGA's argument that the UPCIGA Act provides the amounts payable by UPCIGA on covered claims are to be reduced or offset by amounts recovered under other insurance policies. At issue is whether the offset is subtracted from the $300,000.00 statutory limit or whether the offset is subtracted from a claimant's damages. UPCIGA agrees that if the judicial pronouncement in the declaratory judgment action requires the UPCIGA to calculate the offset from the amount of a claimant's damages and not from the $300,000.00 statutory limit, *UPCIGA will automatically pay R & R Industrial Park, Alumatek, and Repair Express $300,000.00 each for and on behalf of the respective claims against CDR Enterprises.* Additionally, R & R Industrial Park, Alumatek, and Repair Express will assert claims that there are two separate policies applicable to the claims in this action. *If the second/excess policy is adjudicated to increase the statutory limit to $600,000.00 per claimant, R & R Industrial Park, Alumatek, and Repair Express will be required to prove damages only in excess of $300,000.00 each.*

(Emphases added).

## B. SUMMARY JUDGMENT

¶ 10 Pursuant to the Settlement Agreement, a third-party complaint was filed against UPCIGA by R & R and AlumaTek on July 1, 2003. UPCIGA answered the third-party complaint on April 1, 2004, arguing it was not required to pay excess coverage claims and arguing that it was entitled to an offset on its statutory indemnification obligation against funds received by R & R from its first-party insurer.

¶ 11 R & R and AlumaTek filed a joint motion for summary judgment on whether the Guaranty Act provides one or two layers of $300,000 coverage for liability and excess policies, and whether UPCIGA was entitled to an offset against funds received from other insurance carriers.

¶ 12 A hearing was held on February 7, 2005. On February 14, 2005, the court granted summary judgment to R & R and AlumaTek, ruling that UPCIGA must provide coverage of $300,000 for each liability policy as well as up to an additional $300,000 for each excess policy. In addition, the court ruled that UPCIGA could not subtract or offset the amount the plaintiffs received from their first-party property insurers.

## C. EVIDENTIARY HEARING

¶ 13 The Settlement Agreement provided that if the district court found that UPCIGA was obligated to provide coverage for excess policies, an evidentiary hearing would be held to determine R & R and AlumaTek's damages. At the evidentiary hearing, one of R & R's experts testified that R & R had suffered $862,000.31 in damages, and AlumaTek's expert testified that AlumaTek had suffered $918,494 in damages.

¶ 14 In response, UPCIGA presented its own expert who testified that R & R's damages, including offsets for insurance proceeds received from other sources and prejudgment interest, were between $214,789.14 and $394,796.18. UPCIGA's expert also submitted evidence that AlumaTek suffered no uncompensated damages from the fire.

¶ 15 The district court awarded R & R $262,490.77, plus $137,407.90 in prejudgment interest. AlumaTek was awarded no damages.

## D. INVALIDATION OF THE SETTLEMENT AGREEMENT

¶ 16 Five days before the evidentiary hearing, UPCIGA filed a hearing brief in which it argued, among other things, that the court should set aside the entire Settlement Agreement. At the conclusion of the evidentiary

hearing, the court invalidated the Settlement Agreement in its Amended Findings of Fact and Conclusions of Law because it found that R & R and AlumaTek made "less than accurate representations regarding insurance proceeds."

### E.  THE APPEAL

¶ 17 Alumatek filed a notice of appeal on January 25, 2007, to contest the invalidation of the Settlement Agreement.  UPCIGA filed a notice of appeal on January 26, 2007, contesting the granting of summary judgment on the issues of whether the statutory cap applied to multiple policies and whether UPCIGA was entitled to an offset to its liability for payments from third-party insurers.  R & R also filed a notice of appeal on February 8, 2007, contesting the invalidation of the Settlement Agreement.  The Utah Supreme Court has jurisdiction in this matter pursuant to Utah Code section 78A–3–102(3)(j) (Supp.2008).

## ISSUES AND STANDARD OF REVIEW

¶ 18 Whether summary judgment is proper is a question of law.  "An appellate court reviews a trial court's 'legal conclusions and ultimate grant or denial of summary judgment' for correctness, and views 'the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.' "  *Orvis v. Johnson,* 2008 UT 2, ¶ 6, 177 P.3d 600 (quoting *Higgins v. Salt Lake County,* 855 P.2d 231, 233 (Utah 1993)).

¶ 19 Whether the district court correctly interpreted the Guaranty Act is a question of law.  *See Rushton v. Salt Lake County,* 1999 UT 36, ¶ 17, 977 P.2d 1201.  Therefore, "we accord no deference to the legal conclusions of the district court but review them for correctness."  *Id.*

¶ 20 Whether the invalidation of a settlement agreement is proper can be both a question of law and a question of fact.  "Settlement agreements are governed by the rules applied to general contract actions. . . ."  *Butcher v. Gilroy,* 744 P.2d 311, 312 (Utah Ct.App.1987).  The standard of review on the validation or invalidation of a contract "turns on whether the claim is one of fact or law."  *Cal Wadsworth Constr. v. City of St. George,* 865 P.2d 1373, 1375 (Utah Ct.App.1993).  In the present case, the district court invalidated the Settlement Agreement based on an interpretation of law and findings of fact.  However, we reverse that decision based on the district court's interpretation of law, which we review for correctness, giving no deference to its legal conclusions.  *See Rushton,* 1999 UT 36, ¶ 17, 977 P.2d 1201.

## ANALYSIS

¶ 21 We will address the questions at issue in the following order: first, whether the district court correctly interpreted the Guaranty Act, and second, whether the district court properly invalidated the Settlement Agreement.

### I.  THE GUARANTY ACT

¶ 22 The district court granted summary judgment to R & R and AlumaTek on the questions of whether the Guaranty Act applied to multiple claims and whether UPCIGA's liability could be offset by recovery from R & R's and AlumaTek's first-party insurers.  "Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  *IHC Health Servs., Inc. v. D & K Mgmt., Inc.,* 2008 UT 73, ¶ 15, 196 P.3d 588.  The district court in the declaratory action found that there were no issues of fact and the parties do not argue otherwise.

### A.  The Guaranty Act and Multiple Claims

#### 1.  Ambiguity of the Statute

¶ 23 In construing the meaning of a statute we begin by analyzing the plain language.  *Evans v. State,* 963 P.2d 177, 184 (Utah 1998).  We examine the purpose of the statute, its plain language as a whole, and its relation to other statutes.  *State v. Barrett,* 2005 UT 88, ¶ 29, 127 P.3d 682.  If the plain language is unambiguous then we need not look beyond it, *Evans,* 963 P.2d at 184, and no other interpretive tools are needed in

analyzing the statute. *Barrett,* 2005 UT 88, ¶ 29, 127 P.3d 682. We have held that a statute is ambiguous " 'if the terms used to express the intention of the parties may be understood to have two or more plausible meanings.' " *Alf v. State Farm Fire & Cas. Co.,* 850 P.2d 1272, 1274 (Utah 1993) (quoting *Vill. Inn Apartments v. State Farm Fire & Cas. Co.,* 790 P.2d 581, 583 (Utah Ct.App. 1990)).

¶ 24 The relevant part of the Guaranty Act states that "[t]he association is obligated on the amount of the covered claims: (i) existing prior to the order of liquidation; and (ii) arising: (A) within 30 days after the order of liquidation." Utah Code Ann. § 31A–28–207(1)(a) (Supp.2008). The Guaranty Act defines a covered claim as "an unpaid claim . . . if: (i) the claim arises out of the coverage; (ii) the claim is within the coverage; (iii) the claim is not in excess of the applicable limits of an insurance policy to which this part applies." *Id.* § 31A–28–203(4) (2005). In addition, the Guaranty Act states its purpose is "to protect resident policyowners and insureds under all types of direct insurance." *Id.* § 31A–28–202 (2005).

▮ ¶ 25 We conclude that the phrase "[t]he association is obligated on the amount of the covered claims," found in section 31A–28–207(1)(a), is ambiguous because it can be interpreted to apply either to multiple claims or to multiple parties. When a statute is ambiguous, we use extrinsic interpretive tools such as policy and legislative intent to guide our analysis. *Utah Pub. Employees Ass'n v. State,* 2006 UT 9, ¶ 60, 131 P.3d 208.

2. Extrinsic Interpretive Tools: Legislative History, Model Codes, and Other States' Legislation

▮ ¶ 26 "When viewing the act as a whole does not eliminate duplicative yet plausible meanings, the statute is ambiguous, and we may resort to extrinsic interpretive tools to resolve the ambiguity." *Id.* These extrin-

sic tools are used to "discover the underlying intent of the legislature." *Hansen v. Salt Lake County,* 794 P.2d 838, 841 (Utah 1990). This discovery is "guided by the meaning and purpose of the statute as a whole and the legislative history," *id.,* "and relevant policy considerations." *In re Kunz,* 2004 UT 71, ¶ 8, 99 P.3d 793 (internal quotation marks omitted).

¶ 27 In 1985, the legislature rewrote much of the Utah Insurance Code and passed the Guaranty Act. The new Act controls the rules, operation, role, and duties of UPCIGA. Under the Act, UPCIGA is comprised of all insurers licensed to transact insurance business in the State of Utah. Utah Code Ann. § 31A–28–205(1)(b) (2005). UPCIGA steps into the shoes of the insolvent insurer and "has all the rights, duties, and obligations of the insolvent insurer as if the insurer had not yet become insolvent, including the right to pursue and retain salvage and subrogation recoverable on paid covered claim obligations." *Id.* § 31A–28–207(1)(f)(ii) (Supp. 2008). In addition, "[t]he association may assert all defenses available including defenses applicable to determining and enforcing the association's statutory rights and obligations to a claim." *Id.* § 31A–28–207(1)(i)(iii). The legislative history of the Guaranty Act, except for stating that the legislation is "to protect resident policyowners and insureds under all types of direct insurance," is silent on legislative intent. *Id.* § 31A–28–202 (2005).

▮ ¶ 28 Where legislative history is absent or unclear, model codes can be a useful resource in determining the intent of the legislature and underlying policy issues.[3] *See Beckstead v. Deseret Roofing Co.,* 831 P.2d 130, 134 (Utah Ct.App.1992) (using a provision of the Model Code of Professional Responsibility to interpret a similar Utah rule). Consistent with this reasoning, we turn to an analysis of the National Association of Insurance Commissioners (NAIC)[4]

---

**3.** This Court has, for example, previously adopted interpretations from federal law for sections of the Utah Code that are identical to or modeled on federal acts. *See, e.g., W. Coating, Inc. v. Gibbons & Reed Co.,* 788 P.2d 503, 505–06 (Utah 1990); *Se. Furniture Co. v. Indus.*

*Comm'n,* 100 Utah 154, 111 P.2d 153, 154 (1941).

**4.** "[The NAIC] is the organization of insurance regulators from the 50 states, the District of Columbia and various U.S. territories." Donald

Model Laws, Regulations and Guidelines, on which the Guaranty Act is heavily based. *Compare* Nat'l Assoc. Ins. Comm'rs Model Laws, Regulations and Guidelines, Vol. III 540–1 (2007) [hereinafter NAIC Model Guaranty Act], *with* Utah Code Ann. § 31A–28–202 to –222 (2005 & Supp.2008).

¶ 29 While the Utah Guaranty Act is substantially identical to the NAIC Model Guaranty Act, the NAIC Model Guaranty Act is more thorough in its explanation of the intent and purpose of the legislation. NAIC Model Guaranty Act, Vol. III 540–1 § 2. The NAIC Model Guaranty Act clarifies that its purpose is to "minimize financial loss to claimants ... because of the insolvency of an insurer." *Id.* In addition, the NAIC Model Guaranty Act states that this purpose will "constitute an aid and guide to interpretation," thus emphasizing the importance of the purpose of the NAIC Model Guaranty Act as an interpretive tool. *Id.* § 4. Clearly, the NAIC Model Guaranty Act supports an interpretation of the Guaranty Act that will minimize financial loss to insureds whose carriers have become insolvent. An interpretation limiting coverage to single claims would run counter to that purpose because primary carriers, absent insolvency, would enjoy no such limits. The NAIC Model Guaranty Act clearly emphasizes that targeted losses include *all* losses attributable to the insolvency of an insurer. *Id.* § 5.

¶ 30 We next turn to other states' interpretation of similar legislation for further guidance. On the question before us, many states with substantially similar legislation have already dealt with the issue of whether their Guaranty Act covers multiple claims and have held that it does.[5] *See Conn. Ins. Guar. Ass'n v. Union Carbide Corp.*, 217 Conn. 371, 585 A.2d 1216, 1222–23 (1991) (holding that there can be multiple covered claims for each occurrence); *CD Inv. Co. v.*

*Cal. Ins. Guar. Ass'n*, 84 Cal.App.4th 1410, 101 Cal.Rptr.2d 806, 810–11 (2000) (holding each of the five policies issued by two insolvent insurers gave rise to a covered claim). For example, the court in *CD Investment Co.* stated:

As the courts of other states have recognized in applying their own insurance guaranty laws: "[The statute] does not use the word 'occurrence.' It expressly applies the [monetary cap] to 'claims.' There is no basis for substituting the word 'occurrence' for 'claim' in order to aggregate multiple claims arising from a single accident."

*CD Inv. Co.*, 101 Cal.Rptr.2d at 813 (alterations in original).

¶ 31 The court went on to conclude that:

A finding that only one claim may arise out of a single occurrence *would largely defeat the remedial purpose of the ... Guaranty Association Act-to protect claimants and policyholders from financial losses* associated with the insolvency of an insurance company. Recovery against losses resulting from the insolvency of insurance carriers, which the Legislature intended to provide, would often prove illusory. Both the language of [the statute] and the Legislature's expressed intent align us with those courts holding that multiple claims may arise from a single occurrence.

*Id.* (quoting *Oglesby v. Liberty Mut. Ins. Co.*, 832 P.2d 834, 840 (Okla.1992)(alterations in original)(emphasis added)); *see also Wash. Ins. Guar. Ass'n v. McKinstry Co.*, 56 Wash. App. 545, 784 P.2d 190, 193 (1990)(holding that the casualty insurance guarantor remained liable even when the insured had excess insurance policies).

¶ 32 We agree with these courts that an interpretation that only one claim may arise out of a single occurrence would defeat the

J. Walters, *Effecting Efficient Marketplace Change: The Important Role of Independent Standard–Setting Organizations, in* PLI, Commercial Practice, Course Handbook Series No. 11153, 802–03 (2007). "The NAIC, while not a governmental body with regulatory authority, assists state insurance regulators ... to achieve fundamental insurance regulatory goals ... through development of Model Laws and Regulations." *Id.*

5. "All fifty states have adopted some form of the model act." *Zhou v. Jennifer Mall Rest., Inc.*, 699 A.2d 348, 351 (D.C.Cir.1997) (citing Paul G. Roberts, *Insurance Company Insolvencies and Insurance Guaranty Funds*, 74 Iowa L.Rev. 927, 934 (1989)).

remedial purpose of the Guaranty Act. This is true whether the multiple claims arise from primary or excess insurers. This interpretation fits the plain language of the Guaranty Act and is supported by the history of the Guaranty Act, the NAIC Model Guaranty Act, and the interpretation given to similar legislation by other states. Thus we hold that the Guaranty Act applies to multiple claims.

### B. The Offset Provision of the Guaranty Act Applies Only After Full Recovery

¶ 33 We now address whether, as UPCIGA claims, the Guaranty Act may offset UPCIGA's statutory obligations by the amount of recovery from a third-party insurer. We hold that an offset is not permitted under the Act.

### 1. Ambiguity of the Statute

¶ 34 The Utah offset provision is found in Utah Code section 31A–28–213 (Supp.2008):

(1)(a) Any person who has a claim against an insurer, whether or not the insurer is a member insurer, under any provision in an insurance policy, other than a policy of an insolvent insurer that is also a covered claim, is required to first exhaust that person's right under that person's policy. (b) *Any amount payable on a covered claim under this part under an insurance policy is reduced by the amount of any recovery under the insurance policy* described in Subsection (1)(a).

(emphasis added).

¶ 35 There are two competing interpretations of the offset provision, as argued by the parties in this case. UPCIGA's view is that the offset provision applies even in the absence of total recovery of a party's loss. UPCIGA claims the plain meaning of subsection 1(b) therefore allows it to subtract from its $300,000 covered claim obligation *any* amount the claimant has recovered from *any* other insurance policy. This would mean that UPCIGA would be allowed to deduct the $1,517,609.86 paid by CNA to R & R from UPCIGA's $300,000 obligation on Reliance's liability policy, and its $300,000 obligation on Reliance's excess policy. *Id.* This would re-

sult in no liability for UPCIGA for CDR's insolvency. The competing interpretation, as asserted by R & R, is that the offset provision applies only after an insured has received total recovery for its loss. Accordingly, R & R's reading of the statute would allow UPCIGA to offset CNA's payout only from R & R's total loss.

¶ 36 While the language of the provision is susceptible to both interpretations and is therefore ambiguous, our review of the entire statute persuades us that UPCIGA's interpretation is counterintuitive and, in fact, undermines the purpose of the statute, which is to protect the insured from the risks of insolvency of insurance carriers. Offsetting *any* recovery, no matter how great the loss to the insured, would eliminate much, if not all, of the obligation of UPCIGA and deprive insureds of coverage they secured from their insolvent carriers. In the statutory scheme insureds pay premiums that, in part, contribute to UPCIGA's fund. An insured should benefit from those contributions to UPCIGA and of course from the payments of the premiums themselves and should not be penalized for having purchased multiple coverage for large losses.

### 2. Legislative History, Model Codes, and Other State Legislation

¶ 37 Once again, the plain language of the Guaranty Act and the NAIC Model Guaranty Act give us guidance on the intent of the legislature, but they do not conclusively resolve the ambiguity of the offset provision. However, other states have been helpful in exploring the context for a proper interpretation of the offset provision.

¶ 38 There are two connected, but separate concepts at play in the offset provision: the exhaustion concept and the nonduplication of recovery concept. The Guaranty Act states that a party "is required to first exhaust that person's right under that person's policy." Utah Code Ann. § 31A–28–213(1)(a) (Supp. 2008). This means that a party must first recover losses from all other available sources, such as other insurance carriers, before seeking relief from the guaranty association. Since most courts agree that the

guaranty association should be the last resort for recovery, there is not much debate over the meaning of the exhaustion principle. *Wash. Ins. Guar. Ass'n,* 784 P.2d at 193; *Int'l Collection Serv. v. Vermont Prop. & Cas. Ins. Guar. Ass'n,* 150 Vt. 630, 555 A.2d 978, 980 (1988).

¶ 39 The next principle of guaranty associations is that of "nonduplication of recovery" or the prohibition of "double-recovery." In *Zhou,* 699 A.2d 348 (D.C.1997), the court clarified that the nonduplication of recovery principle prevents "a situation in which an insured collects the amount of the *total loss* from one insurance company and then gets an additional sum from [the guaranty association]." *Id.* at 352 (internal quotation marks omitted)(emphasis added). We agree with the court in *Zhou* that nonduplication of recovery means there is no recovery beyond the *total loss.* This makes certain that parties are not better off under the Guaranty Act than they would have been if the insurer had not become insolvent. Much of the confusion in this area arises from parties arguing, as UPCIGA has here, that any recovery from any source, while at the same time recovering from the guaranty association, will lead to "double recovery" even if the total recovery is less than the total loss. We reject this argument.

¶ 40 Other courts have reached this same conclusion. The Connecticut Supreme Court held in *Union Carbide Corp.* that "[t]he evident purpose of providing ... for a reduction of a covered claim 'by the amount of any

recovery' from other available insurance was to prevent a person from twice receiving benefits *for the same loss* or otherwise obtaining a windfall, not to reduce the amount of a claim for a loss that remains partially unsatisfied." 585 A.2d at 1224–25 (emphasis added). Similarly the California Court of Appeals agreeing with the Nevada Supreme Court, noted in *CD Investment Co.,* "that 'the purpose of the [insurance guaranty] act is to place the insured in a position to recover the same amount available under the insured's policy, as if the insurer had not become insolvent, subject only to certain limitations.'" 101 Cal.Rptr.2d at 816 (quoting *Cimini v. Nev. Ins. Guar. Ass'n,* 112 Nev. 442, 915 P.2d 279, 282 (1996))(alteration in original).

¶ 41 Many courts have noted that to allow a guaranty association "to offset its obligation as guarantor of the insolvent policies by amounts paid by solvent insurers that fall short of satisfying a claim for indemnification would seriously undercut the protection that the legislature intended to provide." [6] *Union Carbide Corp.,* 585 A.2d at 1225. "Such a result would penalize the prudent practice of dividing portions of the total liability coverage among different insurers, whether collateral or excess, in order to lessen the risk of insurer insolvency." [7] *Id.; see also Aztec Well Servicing Co. v. Prop. & Cas. Ins., Guar. Ass'n of New Mexico,* 115 N.M. 475, 853 P.2d 726, 731 (1993) ("Moreover, to interpret the Act as the Association does would eviscerate its express purpose of avoiding financial loss to a legitimate claimant as a

6. For example as reasoned by the California Court of Appeals:

   [U]nder CIGA's [California Insurance Guarantee Association] view, a company could purchase two successive policies, each from a different insurer, and each providing $500,000 in coverage. The insured is sued for several million dollars in a case alleging continuous and progressive property damage. One of the insurers has become insolvent, so the insured files a claim with CIGA. The insured also files a claim with the solvent insurer. The case settles for $1 million (a reasonable sum), and the solvent insurer pays its policy limits of $500,000. CIGA could then refuse to pay anything on the ground that the insured had already recovered $500,000. In addition, the insured would sustain a loss on the premiums paid to the insolvent insurer.

*CD Inv. Co.,* 101 Cal.Rptr.2d at 816.

7. The court in *Union Carbide* also concluded that

   CIGA's [Connecticut Insurance Guaranty Association] proposed interpretation effectively reduces the coverage afforded by the insolvent policies to the extent of coverage available under the solvent policies even though the loss remains partially unsatisfied. Thus, it would encourage placing the entire amount of liability coverage with a single carrier in order to make CIGA's resources fully available in the event of insurer insolvency. In such a situation, the impact of the insolvency on CIGA would not be diminished by the availability of other solvent insurers to respond to a portion of the loss and would result in greater depletion of CIGA's resources.

*Union Carbide Corp.,* 585 A.2d at 1225.

result of the insolvency of its insurer to which the claimant paid premiums."); *Wash. Ins. Guar. Ass'n,* 784 P.2d at 194 (finding that allowing the guaranty association to offset the primary insurer's payment would contravene the purpose of the statute); *District of Columbia Ins. Guar. Ass'n v. Nat'l R.R. Passenger Corp.,* 721 F.Supp. 1378, 1382 (D.D.C.1989) (holding first and second level excess insurers were not deducted from Association's liability after one of the four second level excess insurers became insolvent).

¶ 42 In allowing an offset of primary insurance from excess insurance recovery, the New Mexico Supreme Court stated: "To require an offset, as the Association urges, of the amount recovered from the primary insurance carrier against the Association's liability would be absurd because it was that recovery which triggered the application of [the plaintiff's] excess insurance policy in the first place." *Aztec Well Servicing Co.,* 853 P.2d at 731. The New Mexico Supreme Court also stated: "Bound to interpret the Act to implement the Legislature's intent without making its application an absurdity, we hold that payment from the primary insurer cannot be used to offset the Association's pecuniary obligations for the insolvent excess insurer." *Id.*

¶ 43 We find the analysis of these cases persuasive, and hold that the offset provision of the Guaranty Act applies to prevent double recovery of amounts above an insured's total loss. UPCIGA may not deduct or offset any recovery from a third-party insurer from its obligation before the insured has been fully paid for its loss.

## II. INVALIDATION OF THE SETTLEMENT AGREEMENT

### A. The Invalidation of the Settlement Agreement Was Not Properly Raised Before the District Court

¶ 44 The challenge to the validity of the Settlement Agreement was not properly raised before the district court. We have long held that a settlement agreement can only be set aside for "illegality, fraud, duress, undue influence, or mistake." *In re Estate of Chasel,* 725 P.2d 1345, 1348 (Utah 1986). In addition, rule 9(b) of the Utah Rules of Civil Procedure is clear that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Utah R. Civ. P. 9(b). No motion to set aside the agreement was ever made before the district court, and no claims of illegality, fraud, duress, undue influence, or mistake were raised by UPCIGA.

¶ 45 The first mention of the invalidity of the Settlement Agreement in the record is found in UPCIGA's October 13, 2006 brief for the evidentiary hearing, where UPCIGA argued that the agreement was "no longer enforceable because it was based on less than accurate and complete representations from R & R and AlumaTek about their damages and insurance compensation." During the subsequent hearing, there was no testimony offered, argument made, or indeed any discussion at all about the enforceability of the Settlement Agreement. As R & R correctly pointed out in its brief before this court, "[n]o cause of action or counterclaim for rescission based upon illegality, fraud, duress, undue influence or mistake was ever properly before the Court, or even properly pled as a defense for that matter." UPCIGA failed to state in any context the basis for its challenge to the Settlement Agreement with sufficient particularity and merely mentioned "less than accurate and complete representations" as a basis for the invalidation of the agreement in its brief to the trial court. UPCIGA failed to lay out the claim with sufficient clarity and failed to even use the words fraud, mistake, or duress—let alone their required factual components—in its argument on the invalidity of the Settlement Agreement. Because of this, UPCIGA's assertion that the Settlement Agreement was unenforceable did not comport with rule 9(b), and thus it was not properly before the court.

### B. The Invalidation of the Settlement Agreement Was Improper

¶ 46 Settlement agreements "are encouraged to promote harmony and to prevent the waste of assets." *In re Estate of Chasel,* 725 P.2d 1345, 1348 (Utah 1986). We have upheld the importance of settle-

ment agreements and have ruled that "[o]nce formally entered, [a settlement agreement] cannot be set aside merely because one party discovers new evidence which could make the outcome more favorable to that party." *Id.; see also Bohlman v. Big River Oil Co.,* 124 N.W.2d 835, 839 (N.D.1963). UPCIGA entered into the Settlement Agreement in May 2003; however, it cites interactions with R & R *after* the agreement was entered into as providing a basis for the invalidation of the agreement. UPCIGA's first discovery request regarding compensation to R & R from other insurers occurred more than three years after the Settlement Agreement was signed.[8] The receipt of information after the fact cannot be used to invalidate the agreement. It was the responsibility of UPCIGA to ascertain information relevant to its decision to settle before entering into the agreement, and there is no evidence that it attempted to do so. UPCIGA cannot invalidate the Settlement Agreement merely because damages did not end up where it expected they would. "Rather, the agreement can be set aside only for reasons generally available to set aside a [settlement] agreement, i.e., illegality, fraud, duress, undue influence, or mistake." *In re Estate of Chasel,* 725 P.2d at 1348.

¶ 47 The district court cited *Quinn v. City of Kansas City,* for the principle that "[t]he Court has discretion to either enforce or reject a settlement agreement entered into by the parties while the litigation is pending." 64 F.Supp.2d 1084, 1091 (D.Kan.1999). While this is true, the invalidation of the contract must still be based upon one of the required factual bases for setting aside a contract. In addition, *Quinn* is distinguishable because it involved fraud and deception told by the plaintiff in a deposition. No such claims have been made in this case. *Id.* at 1093. UPCIGA did not claim fraud and the district court did not rely on fraud or any other provision of Rule 9(b) to invalidate the Settlement Agreement. UPCIGA's brief references the word fraud only once in relation

to R & R when UPCIGA states that it "does not contend the representations by R & R and AlumaTek were as malicious or fraudulent as the plaintiff in *Quinn*." The trial court's finding of "less than accurate representations regarding insurance proceeds" does not meet the standard for setting aside a settlement agreement.

¶ 48 In summary, UPCIGA failed to allege or prove a factual basis for setting aside the Settlement Agreement under Rule 9(b). We therefore reverse the trial court's grant of summary judgment on that issue.

### C. R & R and AlumaTek Were Not Obligated to Prove the First $300,000 in Damages

¶ 49 While the plaintiff usually has the burden of proof regarding damages, *see Carlson Distrib. Co. v. Salt Lake Brewing Co.,* 2004 UT App. 227, ¶ 19, 95 P.3d 1171, in this case the Settlement Agreement altered that requirement. The Settlement Agreement stated that "UPCIGA will automatically pay R & R Industrial Park, AlumaTek, and Repair Express $300,000.00 each for and on behalf of the respective claims against CDR Enterprises" if R & R and AlumaTek won in the declaratory action involving the interpretation of the Guaranty Act.

¶ 50 Therefore, R & R and AlumaTek do not have to prove any damages to recover their first $300,000 in damages. Any recovery in excess of this amount must be proved. The district court erroneously ruled that "R & R and AlumaTek must meet their burden of proof before they are entitled to any damages."

### CONCLUSION

¶ 51 R & R and AlumaTek are entitled to UPCIGA's statutory limit of $300,000 under both the primary and excess policy issued by Reliance to CDR under the Guaranty Act. In addition, R & R and AlumaTek are entitled to have the Settlement Agreement they en-

---

**8.** There is some dispute as to when R & R provided information on the amount of $174,227 in compensation for lost rents. However, the record shows that R & R provided this information to CDR five months before UPCIGA entered into the Settlement Agreement. UPCIGA had complete access to all the documents already exchanged in the underlying lawsuit, and had access to this data.

tered into with UPCIGA enforced as written, as no claim for invalidation was ever properly before the district court, and there was no factual or legal basis for invalidation. We hold that because the Settlement Agreement is enforceable, $300,000 will automatically be paid to R & R and AlumaTek as to the first policy claim. In addition, because R & R alone has proven $99,898.67 in additional damages, R & R is entitled to that amount under the excess policy claim because the Guaranty Act applies to multiple claims. We reverse and remand to the district court for entry of judgment.

¶ 52 Associate Chief Justice DURRANT, Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM'S opinion.