2010 UT 47

Farley ANDERSON; Helen Anderson; Steven G. Maxfield; and Steven K. Maxfield, Petitioners,

v.

Lt. Governor Gregg BELL; Mark Thomas; Paul Neuenschwander; Spencer Hadley; and John Does 1–10, Respondents.

No. 20100237.

Supreme Court of Utah.

June 22, 2010.

Brent V. Manning, Tyson B. Snow, Karen McCreary, Marina Baginsky Lowe, Salt Lake City, Joann S. Secrist, St. George, Utah, for petitioners.

Steven G. Maxfield, Kanosh, Utah, Pro Se, Mark L. Shurtleff, Att'y Gen., Thom D. Roberts, Asst. Att'y Gen., Lohra L. Miller, Jason Rose, Salt Lake City, David L. Patterson, Brock R. Belnap, St. George, Utah, for respondents.

David R. Irvine, Alan L. Smith, Salt Lake City, for intervenor.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 This petition for extraordinary writ asks us to resolve whether a candidate may use electronic signatures to satisfy the signature requirement that the Utah Code imposes on those who wish to run for statewide office but do not affiliate with a registered political party. In other words, does an electronic signature count toward a "signed" nomination certificate under section 20A–9–502 of the Utah Code.

¶ 2 Petitioner Farley Anderson wishes to run for governor without affiliating with a registered political party. As an unaffiliated candidate, Mr. Anderson must, among other requirements of Title 20A, collect the signatures of 1,000 registered voters before his name may be placed on the statewide ballot. Mr. Anderson collected the necessary signatures in two forms: hand-signed signatures, and electronic signatures entered through a computer website advocating his candidacy. Mr. Anderson then followed the statutory procedure that requires him to first submit the signatures to county clerks throughout the state for verification that each signor is a registered voter and has not signed the petition of any other unaffiliated candidate. Clerks in seven counties apparently certified that 1,055 of the signatures submitted by Mr. Anderson were valid. Upon county-clerk verification, unaffiliated candidates must submit their signatures and a completed certificate of nomination to the Lt. Governor by a statutorily defined date.

¶ 3 On March 19, 2010, Mr. Anderson submitted his petition and the supporting signatures to the Lieutenant Governor's Office. The Lt. Governor, however, excised the electronic signatures from Mr. Anderson's nomination, taking the position that electronic signatures do not constitute signatures under the Utah Election Code. Without those signatures, Mr. Anderson's nomination fell short of the mandatory 1,000 signatures and the Lt. Governor rejected him as a candidate for the forthcoming gubernatorial election.[1]

---

1. Mr. Anderson filed his petition with this court pursuant to rule 19 of the Utah Rules of Appellate Procedure. By doing so, Mr. Anderson bypassed a review of the Lt. Governor's action by the district court under rule 65B of the Utah Rules of Civil Procedure. Rule 19 allows the Utah Supreme Court "to entertain writ proceedings under rule 65B in appropriate circum-

¶4 Mr. Anderson responded to the Lt. Governor's decision by filing this petition for extraordinary writ under rule 19 of the Utah Rules of Appellate Procedure.[2]

## STANDARD OF REVIEW

¶5 Because rule 19 authorizes this court to entertain petitions for extraordinary writ under rule 65B of the Utah Rules of Civil Procedure, the standards enumerated in the latter rule dictate our standard of review. *Walker v. Weber County,* 973 P.2d 927, 929–30 (Utah 1998). Given that Mr. Anderson's argument is founded on a theory that the Lt. Governor lacks authority to remove signatures from a certificate of nomination under Utah Code section 20A–9–502 (Supp.2009), the petition is best articulated as falling within subpart c of rule 65B; a party may seek relief where an individual "unlawfully ... exercises a public office." Utah R. Civ. P. 65B(c)(2)(A). We review whether a government actor has " 'unlawfully' exercised the authority of their office" through an "abuse of discretion standard." *Walker,* 973 P.2d at 929 (quoting Utah R. Civ. P. 65B(c))("[W]e determine only whether the officials have so exercised their discretion that it can be said that they have failed to do what the statute

requires, or have done something which the statute does not permit.").

## ANALYSIS

¶6 Mr. Anderson's petition for extraordinary writ presents two primary arguments supporting his position that he is entitled to have his name placed on the forthcoming ballot for the governor's seat. First, he argues electronic signatures plainly satisfy the requirements of Utah Code section 20A–9–502 (Supp.2009). A corollary to this argument is a theory that the statutory scheme does not give the Lt. Governor the authority to define what constitutes to a valid signature. Alternatively, Mr. Anderson makes a number of constitutional arguments. The most notable of these is a claim that the Election Code's early statutory deadline imposed upon unaffiliated candidates to file a certificate of nomination violates the protections of the United States and Utah Constitutions.

¶7 Given our ultimate holding that an electronic signature satisfies the signature mandate imposed on unaffiliated candidates, we decline to address Mr. Anderson's constitutional claims. *See State ex rel. Z.C.,* 2007 UT 54, ¶5, 165 P.3d 1206 (stating that we

---

stances." *Walker v. Weber County,* 973 P.2d 927, 929 (Utah 1998) (holding extraordinary writ procedures may be invoked when it is *"practically impossible"* for the petitioner to first proceed in the district court because of the county's late adoption of a ballot title (emphasis added)).

In this situation, we employ an appropriate-circumstances test because a petitioner's decision to seek relief through rule 19 without first petitioning the district court has an influence on our analysis. Most notable of these impacts is that an adjudication of the facts by the district court has not occurred. Thus, the facts referenced in this opinion are unproven allegations by Mr. Anderson. In certain circumstances, this procedural posture may prevent us from deciding the petition for extraordinary writ under rule 19. We are, however, satisfied that the general allegation—that Mr. Anderson's certificate for nomination had more than 1,000 verified signatures when he presented it to the Lt. Governor but less than 1,000 signatures after the Lt. Governor excised the electronic ones—is concrete enough to permit us to entertain Mr. Anderson's petition for extraordinary writ. Indeed, the Lt. Governor's response to Mr. Anderson's petition for extraordinary writ does not refute this general allegation.

Moreover, we are satisfied that this petition presents an "appropriate circumstance" under rule 19. The primary election will be held on June 22. At this primary election, registered political parties will select their candidates. Those candidates will then take their campaigns to the voters of the state. Any legal dispute over the propriety of Mr. Anderson's inclusion on the November ballot that continues after the primary election will negatively impact Mr. Anderson's ability to campaign against the other recognized candidates seeking Utah's gubernatorial seat; it is "practically impossible" for Mr. Anderson to proceed first in the district court and still have any reasonable opportunity to make his campaign effective.

2. The Utahns for Ethical Government (UEG) filed a memorandum supporting Mr. Anderson's Petition for Extraordinary Writ as an amicus curiae. In its memorandum, however, UEG argues that we should determine that an electronic signature satisfies the signature requirement of a voter initiative under Title 20A, chapter 7. We decline to address this issue in this petition for extraordinary writ.

need not address "'constitutional issues unless required to do so'" and resolving an appeal on statutory grounds while not addressing the parties' constitutional arguments (quoting *Lyon v. Burton*, 2000 UT 19, ¶ 10, 5 P.3d 616)). Additionally, we can strike Mr. Anderson's early-deadline argument because it was not in his original petition for extraordinary writ and first surfaced at oral argument and in his supplemental briefing. *See* Utah R.App. P. 19(b)(7) (requiring petitioners to file a memorandum with "points and authorities in support of the petition"); *see also* Utah R.App. P. 24(a)(9) (requiring appellants to provide "contentions and reasons ... with respect to the issues presented").

## I. THE SIGNATURE REQUIREMENT OF SECTION 20A–9–502 MAY BE SATISFIED WITH AN ELECTRONIC SIGNATURE

■ ¶ 8 Mr. Anderson's petition for extraordinary writ can be resolved by answering a single, distinctive question: what is a "signature" under section 20A–9–502? Or more specifically, does an electronic signature qualify as a valid signature under this statutory subsection?

■ ¶ 9 Our goal when confronted with questions of statutory interpretation "is to evince the true intent and purpose of the Legislature." *Duke v. Graham*, 2007 UT 31, ¶ 16, 158 P.3d 540 (internal quotation marks omitted); *Gohler v. Wood*, 919 P.2d 561, 562–63 (Utah 1996). It is axiomatic that the best evidence of legislative intent is "the plain language of the statute itself." *Duke*, 2007 UT 31, ¶ 16, 158 P.3d 540 (internal quotation marks omitted). But our plain language analysis is not so limited that we only inquire into individual words and subsections in isolation; our interpretation of a statute requires that each part or section be "'construed in connection with every other part or section so as to produce a *harmonious whole*.'" *Sill v. Hart*, 2007 UT 45, ¶ 7, 162 P.3d 1099 (emphasis added) (quoting *State v. Maestas*, 2002 UT 123, ¶ 54, 63 P.3d 621); *State v. Schofield*, 2002 UT 132, ¶ 8, 63 P.3d 667. Moreover, "the purpose of the statute" has an influence on the plain meaning of a statute. *R & R Indus. Park, L.L.C. v. Utah Prop. & Cas. Ins. Guar. Ass'n*, 2008 UT 80, ¶¶ 23, 36, 199 P.3d 917.

¶ 10 The statute we are called upon to interpret to resolve Mr. Anderson's petition is section 20A–9–502. In subpart one of this statute, individuals must circulate a certificate of nomination and obtain "the required number of *signatures* of registered voters required by law." Utah Code Ann. § 20A–9–502(1) (Supp.2009) (emphasis added) (providing a certificate of nomination form). Subpart two of this section describes the procedures the prospective candidate must follow to gain access to the ballot. It states:

> (a) The candidate shall circulate the nomination petition and submit it to the county clerk for certification when the petition has been *completed by*: (i) at least 1,000 registered voters residing within the state....

> (b) In reviewing the petition, the county clerk shall count and certify only those persons who *signed* the petition who: (i) are registered voters ...; and (ii) did not sign any other certificate of nomination for that office.

*Id.* § 20A–9–502(2) (emphasis added). The legislature, however, did not define what the terms "signature," "signed," or "completed" mean within this subsection. Moreover, the parties have alerted us to no other provision within Title 20A that provides a definition of these terms. *See generally id.* § 20A–1–102 (providing definitions governing Title 20A but not including the terms "signature," "sign," or "complete" within the list).

### A. We Must Liberally Construe the Statutory Framework Covering Unaffiliated Candidates to Give Them Every Reasonable Opportunity to Make Their Candidacy Effective

■ ¶ 11 The legislature has provided us with specific guidance when considering the statutory framework controlling nomination petitions of unaffiliated candidates. The legislature directed that "[t]he courts shall construe this part *liberally* so as to give unaffiliated candidates for public office *every reasonable opportunity* to make their candidacy effective." *Id.* § 20A–9–501(3) ·(2007)

(emphasis added). As we stated previously, the legislative purpose underlying a statute influences the plain language employed by the legislature. *R & R Indus. Park*, 2008 UT 80, ¶ 36, 199 P.3d 917. The language directing courts to "liberally" construe part 5 of chapter 9 reveals a legislative purpose that favors unaffiliated candidates' access to the ballot. Section 20A–9–501(3) plainly directs us to liberally construe part 5 to give this category of candidate every reasonable opportunity to get on the ballot and campaign for political office. Moreover, the directive to liberally construe the statutory framework appears in only one other place in the Election Code. Part 4 of chapter 9 opens with the mandate that the statutory scheme governing primary elections "be construed liberally so as to ensure full opportunity for persons to become candidates...." *Id.* § 20A–9–401(1). This section, like its unaffiliated-candidate counterpart, extends a liberal-construction directive to the statutes governing candidate names appearing on election ballots in general. *Compare id.* § 20A–9–501 *with* § 20A–9–401(1).

¶ 12 We find significance in the fact that the legislature assigned a liberal-construction mandate only to the Election Code's provisions governing candidate access to the ballot. The directives found in parts four and five of chapter 9 thus make legislative intent plain and unambiguous: when it comes to potential candidate access to the ballot, regardless of whether they are affiliated with a political party or not, courts must liberally construe the governing statutes to afford them a full and reasonable opportunity to become a candidate. This is not to say that the court can disregard the statutory requirements created by the Election Code. We cannot waive the 1,000–signature requirement. But we also cannot ignore the legislature's unequivocal directive to construe the provisions at stake here liberally to give

Mr. Anderson "every reasonable opportunity to make" his candidacy effective.

### B. The Utah Code Defines a "Signature" to Include Electronic Signatures

■ ¶ 13 It cannot be disputed that when the legislature used the terms "signature" and "sign," it contemplated that a handwritten name would satisfy the requirement.[3] *See* The American Heritage Dictionary 1139 (2d ed. 1985) (defining "signature," in part, as the "name of a person as *written* by himself" (emphasis added)); Blacks Law Dictionary 1415 (8th ed. 2004) (defining "signature," in part, as a "person's name or mark *written* by that person or at the person's direction" (emphasis added)). But there also are strong statutory indicators that the legislature did not intend that a signature placed by hand is the only valid and legally recognizable form of a signature.

#### 1. Section 68–3–12 Contemplates Electronic Signatures

¶ 14 Most notable of these statutory indications is section 68–3–12.[4] Before discussing this subsection, we note that section 68–3–12 is of critical weight to our analysis. This section imposes "[r]ules of construction" upon the courts and directs that "the definitions listed in [section 68–3–12(2)] shall be observed, unless the definition would be inconsistent with the manifest intent of the Legislature, or repugnant to the context of the statute." Utah Code Ann. § 68–3–12(2) (2008). Section 68–3–12 is the set of default definitions that the legislature imposed upon the entire Utah Code. In enacting this section, the legislature unequivocally laid out statutory definitions that govern our interpretation of the Utah Code so long as the terms of section 68–3–12 do not contradict the "manifest" legislative intent of the specific statute or become "repugnant to the context of the statute." We would be neglectful

---

3. Statutory interpretation presumes a legislative process that " 'use[s] each word advisedly and give[s] effect to each term according to its ordinary and accepted meaning.' " *State v. Laycock*, 2009 UT 53, ¶ 19, 214 P.3d 104 (alteration in original) (quoting *State v. Low*, 2008 UT 58, ¶ 23, 192 P.3d 867).

4. We note that the legislature amended section 68–3–12 during the 2010 legislative session to divide the rules of construction and the general definitions governing the Utah Code into two separate sections. Even if these amendments applied to this case, they would not affect the outcome of Mr. Anderson's petition because they did not alter the provisions at issue here.

in our interpretation if we were to ignore terms clearly defined in section 68–3–12 but left undefined in section 20A–9–502. Indeed, the very purpose of section 68–3–12 was to fill in the gaps of other statutory sections.

¶ 15 Section 68–3–12 defines "signature" to include a "name, mark, or sign written with the intent to authenticate any instrument or writing." *Id.* § 68–3–12(2)(w). The legislature added further clarification to the meaning of signature by defining "writing" as including "printing," "handwriting," and "information stored in an electronic or other medium if the information is retrievable in a perceivable format." *Id.* § 68–3–12(2)(cc). Section 68–3–12 explicitly contemplates electronic signatures. A signature includes any "name, mark, or sign written "with an" intent to authenticate" "information stored in an electronic ... medium." Utah Code Ann. § 68–3–12(2)(w) & –12(2)(cc). Additionally, it appears the legislature's definition of a signature here is more concerned with the intent of the signor than the form of the signature. The legislature plainly stated that a signature is any sign made with an "intent to authenticate." *Id.* § 68–3–12(w). Further evidence of the significance of the signor's intent is found in the Uniform Electronic Transactions Act (UETA). The UETA, which will be discussed more thoroughly below, defines an "electronic signature" as "an electronic sound, symbol, or process ... executed or adopted by a person with the *intent to sign* the record." Utah Code Ann. § 46–4–102(8) (2005) (emphasis added).

■ ¶ 16 Moreover, the importance of the intent of the signor, as opposed to form of the signature, has been identified in the common law of this state.[5] For instance, in *Salt Lake City v. Hanson* we stated, "it is the intent rather than the form of the act that is important." 19 Utah 2d 32, 425 P.2d 773, 774

(1967). While our definition of a signature found in *Hanson* has greater detail, our common law definition mirrors the definition enacted by the legislature. *Compare* Utah Code Ann. § 68–3–12(2)(w) (2008) (defining a legally recognized signature as any "name, mark, or sign written with the intent to authenticate") *with Hanson,* 425 P.2d at 774 (stating the intent to sign, not the form, matters). In section 68–3–12, the legislature did not limit a signature to handwriting only and neither have our cases.

> While one's signature is usually made by writing his name, the same purpose can be accomplished by placing *any writing, indicia or symbol* which the signer chooses to adopt and use as his signature and by which it may be proved: e.g., by finger or thumb prints, by a cross or other mark, or by *any type of mechanically reproduced* or stamped facsimile of his signature, as effectively as by his own handwriting.

*Hanson,* 425 P.2d at 774 (emphasis added); *see also State v. Montague,* 671 P.2d 187, 191 (Utah 1983) (finding an imprinted name of a judge made by a court clerk a signature); 17A Am. Jur. 2d. *Contracts* § 176 (2004) ("[A] signature is whatever mark, symbol, or device one may choose to employ to represent oneself, and may include fingerprints.... 'Electronic' signatures are valid, and legislation has been enacted specifically to authorize them.") (footnotes omitted); Blacks Law Dictionary 1415 (defining a signature as "[a]ny name, mark, or writing used with the intention of authenticating a document").

¶ 17 Thus, with the foregoing discussion of section 68–3–12, the UETA, the common law articulation that mirrors these statutory provisions, and the legislature's liberal-construction mandate in mind, we conclude that the plain language of section 20A–9–502 is not limited to handwritten signatures. It is true that the legislature designed the Election

---

5. It is a fundamental principle that while the legislature has the authority to abrogate the common law, every instance that a statutory scheme and the common law converge does not necessarily mean the legislature has abolished the common law. *See C.T. v. Johnson,* 1999 UT 35, ¶ 33, 977 P.2d 479 (Zimmerman, J., dissenting) ("The fact that a statute contains a partial codification of a particular rule or principle of the

common law does not necessarily abrogate the remainder of the common law." (internal quotation marks omitted)). In this instance we believe the legislature's enactment of section 68–3–12, and to a lesser extent the UETA, was an adoption of the common law definition of signature. As such it is appropriate to reference the common law as we interpret the plain meaning of a statutory scheme.

Code with a paper-format in mind; an electronic format would not have been available at the time the scheme was designed. But the legislature also left open the possibility that a signor may lend his name to a certificate for nomination in a way other than by putting pen to paper when it enacted section 68–3–12(2) and the UETA. Indeed, the legislature focused in those provisions on the intent of the signor, not the form of the signature. We cannot see how the manner the signor elects to place his name on an unaffiliated candidate's petition for nomination has any impact on the signor's intent to support the petitioner's candidacy. Moreover, we cannot see how section 68–3–12(2) can be viewed as contradicting the legislative intent of section 20A–9–502, when the legislature itself demands that we liberally construe the provisions governing unaffiliated candidates to give them "every reasonable opportunity to make their candidac[ies] effective." Utah Code Ann. § 20A–9–501(3) (2009). Thus, we hold that the signature requirement of section 20A–9–502 includes electronic signatures.

2. The Uniform Electronic Transactions Act Applies to the Utah Election Code Governing Unaffiliated Candidates

¶ 18 We find additional support for our conclusion in the Utah Code's UETA. Utah Code Ann. §§ 46–4–101 to 503 (2005 & Supp. 2009). The UETA "applies to electronic records and electronic signatures relating to a transaction." *Id.* § 46–4–103(1) (Supp. 2009). In enacting the UETA, the legislature specifically addressed what types of transactions could *not* be authenticated with an electronic signature. The legislature excluded *only* "wills, codicils, ... testamentary trusts" and transactions within the scope of the Uniform Commercial Code from the provisions of the UETA. *Id.* § 46–4–103(2). This list demonstrates that there were specific documents that the legislature did not believe were appropriately authenticated through electronic means. By contrast, the UETA is silent on the topic of elections, campaigning, ballot access, or the Election Code generally. We cannot of course construe the absence of this subject matter from section 46–3–103 as a legislative endorsement. Rather, we note

the exclusionary list for the purpose of showing that the requirements of the Election Code are *not* specifically excluded from the UETA. Therefore, the UETA will govern electronic signatures where its other requirements can be satisfied.

¶ 19 Mr. Anderson argues that the UETA authorizes electronic signatures to satisfy the signature requirement of section 20A–9–502. Specifically, he points to section 46–4–201 for this proposition. This section states: "If a law requires a signature, an electronic signature satisfies the law." *Id.* § 46–4–201(4) (2005). This language could not be more straight forward; an electronic signature will satisfy any law that demands a signature. And, as noted above, there are only four situations where an electronic signature will not satisfy the law—wills, codicils, testamentary trusts, and certain agreements under the UCC. Mr. Anderson has thus done exactly what section 46–4–201 permits. He used electronic signatures to satisfy the Election Code's demand that unaffiliated candidates collect and submit the signatures of 1,000 registered voters in order to get his name onto the statewide ballot.

¶ 20 The Lt. Governor, however, does not acknowledge this statutory language but points to other provisions of the UETA that he contends require us to reject the application of the UETA to the Election Code or at least to Mr. Anderson's certificate of nomination. First, he argues these subsections allow government agencies to reject the use of electronic signatures. Second, the Lt. Governor argues that as a party to the transaction, he must agree to conduct the transaction by electronic means before the electronic signature is valid. We reject both arguments.

¶ 21 Turning first to the theory that the legislature has granted state agencies broad discretion to refuse to conduct business through electronic means. The Lt. Governor finds support for this argument in section 46–4–501. This section states:

A state governmental agency *may*, by following the procedures and requirements of Title 63G, Chapter 3, Utah Administrative Rulemaking Act, *make rules* that: (a)

identify specific transactions that the agency is willing to conduct by electronic means; [and] (b) identify specific transactions that the agency will never conduct by electronic means. . . .

Utah Code Ann. § 46–4–501(1) (Supp.2009) (emphasis added). The Lt. Governor argues that Mr. Anderson's use of electronic signatures to satisfy the signature requirement of the Election Code is an attempt to force his office, in contravention of the plain language of section 46–4–501, to permit the use of electronic signatures. The Lt. Governor's argument fails to acknowledge that this subsection has a rulemaking component. The language of section 46–4–501(1) plainly permits governmental agencies to dictate what transactions they are willing to conduct through electronic means and what transactions they are unwilling to do via electronic means. *Id.* § 46–4–501(1)(a) & (b). But this subsection also requires the state agency to make this determination through the rulemaking procedures required by Title 63G. The Lt. Governor's argument here asks us to interpret this statute to find that when a government agency has *not promulgated rules* that control electronic signatures and transactions, then the agency will not conduct business through electronic means. That is not what this statute says; subsection 46–4–501(1) authorizes state agencies to "make rules" to manage electronic transactions, and if the agency opts to exercise this power, it can decide which records to accept in electronic form. This subsection has no application when the agency has done nothing to promulgate rules for electronic records under Title 63G.[6]

¶ 22 The Lt. Governor also argues that subsection 46–4–501(4) precludes Mr. Anderson from forcing his office to accept a certificate of nomination supported by elec-

tronic signatures. Indeed, subsection 46–4–501(4) states *"nothing in this chapter requires* any state governmental agency to: (a) conduct transactions by electronic means; or (b) *use or permit the use of* electronic records or *electronic signatures."* (emphasis added). This language read in isolation renders the Lt. Governor's position plausible. The argument, however, loses its persuasive effect when we harmonize this subsection with the rest of section 46–4–501, the remainder of the UETA, section 68–3–12, and the Election Code. *See Sill v. Hart,* 2007 UT 45, ¶ 7, 162 P.3d 1099 (stating that part of this court's attempt to determine the plain language of a statute is to construe the statute at issue " 'with every other part or section so as to produce a harmonious whole' " (quoting *State v. Maestas,* 2002 UT 123, ¶ 54, 63 P.3d 621)); *State v. Schofield,* 2002 UT 132, ¶ 8, 63 P.3d 667 (" '[T]he plain language of a statute is to be read as a whole, and its provisions interpreted in harmony with other provisions in the same statute and with other statutes under the same and related chapters.' " (quoting *Lyon v. Burton,* 2000 UT 19, ¶ 17, 5 P.3d 616)).

¶ 23 As previously discussed, section 46–4–501 is a rulemaking statute. It states that governmental agencies "may . . . make rules" to govern electronic transactions and electronic signatures. Read in the context of the statute as a whole, subsection four is in place to ensure that state agencies have broad discretion in setting up what types and classes of transactions are appropriately conducted through electronic means when they engage in rulemaking. The rulemaking requirement is critical; the statute does not authorize government agencies to make informal decisions on what type of transactions cannot be supported by electronic signatures outside of the rulemaking process of Title

---

6. Indeed, the other provisions of section 46–4–501 support a reading that this section was designed to give state agencies the power to enact rules to manage electronic records. For instance, subsection 46–4–501(1)(c) affords agencies the authority to "specify the manner and format in which electronic records must be created, generated, sent, communicated, received and stored." Utah Code Ann. § 46–4–501(1)(c) (Supp.2009). Subsection 46–4–501(2) requires state agencies that promulgate rules under the

UETA to give copies of those rules to the state's chief information officer and the Utah Technology Commission. Subsection 46–4–501(3) permits the state's chief information officer to "prepare model rules and standards relating to electronic transactions." *Id.* § 46–4–501(3)(a). Finally, this subsection requires state agencies to retain electronic records in conformity with standards developed by the state's Division of Archives. *Id.* § 46–4–501(5)(a)

63G. Moreover, the Lt. Governor's argument is in conflict with the UETA's provision that expressly permits an electronic signature to satisfy *any law* that requires a signature. Utah Code Ann. § 46–4–201(4) (2005). It also contradicts the UETA's mandate that an electronic signature "may not be denied legal effect or enforceability solely because it is in electronic form." *Id.* § 46–4–201(1).[7] Moreover, the Lt. Governor's argument is in conflict with section 46–4–106, which directs the construction and application of the UETA. This section demands that the UETA "be construed and applied: (1) to facilitate electronic transactions ...; [and] (2) to be consistent with reasonable practices concerning electronic transactions and with the continued expansion of those practices." *Id.* § 46–4–106. To follow the Lt. Governor's logic would do the opposite; the Lt. Governor's interpretation curbs electronic transactions rather than facilitates them.

¶ 24 Going beyond the UETA, we cannot square the Lt. Governor's argument with a plain language reading of section 68–3–12 (2008), which, as we previously stated, allows for electronic signatures. Finally, the Lt. Governor's position is contradicted by the purpose underlying the Election Code. The legislature directed courts to liberally construe the provisions pertaining to unaffiliated candidates and their attempts to get on the ballot. *Id.* § 20A–9–501(3) (2007).

¶ 25 Alternatively, the Lt. Governor argues that he is a "party" to the signing transaction, and that as such he must agree to conduct it via electronic means. The UETA "applies only to transactions between parties each of which has agreed to conduct transactions by electronic means." *Id.* § 46–4–105(2)(a) (2005). The Lt. Governor argues that the transaction at issue here is between the prospective candidate and the Lt. Governor, who is the chief election officer under section 20A–2–300.6 (2007). Again, the Lt. Governor's argument fails to read the statutory scheme in harmony with the Election Code. Under section 20A–9–502(2)(a), the would-be candidate circulates a petition for nomination to registered voters. The circulator does not turn the petition for nomination over to the county clerks for verification until after the petition is "completed by" 1,000 registered voters. *Id.* § 20A–9–502(2)(a) (Supp.2009). We take the term "completed" to mean the transaction is closed. Moreover, treating the transaction as between the circulating nominee and the signor makes the most logical sense; it is an authentication that the signee supports the circulator's bid to have his name on the ballot as a candidate for statewide office. We fail to see how including the Lt. Governor as a party to this agreement has an impact on this transaction and the authentication of the signor's support.[8] Under the Election Code, the Lt. Governor's interest here is in ensuring that the unaffiliated candidate has sufficient support to justify including him or her on the statewide ballot. That interest is not diminished because the unaffiliated candidate demonstrates the necessary support through signatures recorded electronically.

¶ 26 We hold that electronic signatures may satisfy the Election Code's requirements

---

7. The Lt. Governor argues that his office did not reject the electronic signatures in Mr. Anderson's certificate of nomination on the sole basis that they were in electronic form. Rather, he contends that electronic signatures attached to a certificate of nomination lack "apparent authority" as genuine signatures. This position is based on a theory that a holographic signature is self-authenticating because the reviewing party may merely look at the signature and see that someone put pen to paper to sign their name: In contrast, an electronic signature lacks apparent authority, because it appears as a typed list of names. The Lt. Governor's argument here, however, is really about fraud and the ability to detect fraud. We are unpersuaded that an electronic signature presents special concerns regarding candidate fraud; a candidate could as easily handwrite or type fraudulent names onto a certificate of nomination.

   Moreover, electronic signatures may be a better deterrent to candidate fraud because an electronic signature incorporates readily verifiable personal, but not-public, information. For instance, the signors of Mr. Anderson's petition apparently had to enter a security code that corresponds to the last four digits of their driver license number before their signature would be counted.

8. The UETA defines a transaction as "an action or set of actions occurring between two or more persons relating to the conduct of business, commercial, or governmental affairs." Utah Code Ann. § 46–4–102(16) (2005).

under section 20A–9–502 regarding unaffiliated candidates wishing to run for statewide office. This holding is consistent with the rest of the Utah Code and permits candidates who do not wish to join a registered political party a reasonable opportunity to make their candidacy effective. Thus, we conclude that the Lt. Governor exceeded the bounds of his discretion when he excised the electronic signatures attached to Mr. Anderson's certificate of nomination.

### CONCLUSION

¶ 27 When the legislature adopted section 20A–9–502, it required would-be candidates who wish to run for statewide office but do not want to associate with a registered political party to obtain the signatures of 1,000 registered voters. While handwritten signatures clearly satisfy the signature requirement of this statute, holographic signatures are not the only means to sign a document. Indeed, the Utah Code expressly contemplates electronic signatures under 68–3–12 and the UETA. Ultimately, we are persuaded that a signature under section 20A–9–502 does not require a signor to physically handle a piece of paper and sign her name with a pen; an electronic signature is sufficient to satisfy the Election Code.

¶ 28 We therefore hold that the Lt. Governor exceeded the bounds of discretion granted to him as the state's chief election officer when he excised the electronic signatures attached to Mr. Anderson's certificate of nomination. We, therefore, grant Mr. Anderson his writ of extraordinary relief and instruct the Lt. Governor to recount the signatures submitted by Mr. Anderson on March 19, 2010 to determine if he has satisfied the requirements of section 20A–9–502.

¶ 29 Associate Chief Justice DURRANT, Justice PARRISH, Justice NEHRING, and Judge DAWSON concur in Chief Justice DURHAM'S opinion.

¶ 30 District Judge GLEN R. DAWSON sat.