*This opinion is subject to revision before final publication in the Pacific Reporter*

**2017 UT 18**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

TESLA MOTORS UT, INC.,
*Petitioner*,

*v.*

UTAH TAX COMMISSION; UTAH MOTOR VEHICLE ENFORCEMENT
DIVISION,
*Respondents.*

No. 20150792
Filed April 3, 2017

On Petition for Review of Final Agency Action

Attorneys:

George Riley, Anne E. Huffsmith, Elysa Q. Wan, San Francisco, pro
hac vice, Francis M. Wikstrom, Michael P. Petrogeorge, Salt Lake
City, for petitioner

Sean D. Reyes, Att'y Gen., Tyler R. Green, Solic. Gen., Stanford
Purser, Deputy Solic. Gen, Gale K. Francis, Laron J. Lind, Asst. Att'ys
Gen., Salt Lake City, for respondents

Michael D. Black, Dick J. Baldwin for amicus curiae Utah Auto
Dealers Association d/b/a New Car Dealers of Utah

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in
which CHIEF JUSTICE DURRANT, JUSTICE DURHAM, JUSTICE HIMONAS,
and JUSTICE PEARCE joined.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1     This case comes to us on a petition for review of a final
decision of the Utah Tax Commission. In the proceedings below, the
commission affirmed the administrator of the Utah Motor Vehicle
Enforcement Division's decision to deny an application for a license
to sell new motor vehicles. The license application in question was
submitted by Tesla Motors UT, Inc., a wholly owned subsidiary of
Tesla, Inc., a motor vehicle manufacturer. In denying Tesla UT's

application, the Division determined that the application implicates both the Motor Vehicle Business Regulation Act (Licensing Act), UTAH CODE § 41-3-101, and the New Automobile Franchise Act, *id.* § 13-14-101.

¶2　The threshold question presented is whether those statutes together prohibit a wholly owned subsidiary of a motor vehicle manufacturer from obtaining a license to sell the manufacturer's new motor vehicles in stores in Utah. We hold that they do. We interpret the statutes to prohibit a motor vehicle manufacturer from owning part of any separate entity that sells the manufacturer's new motor vehicles in this state. We also uphold the statutory scheme against Tesla UT's constitutional attack. And we accordingly affirm the Tax Commission's decision affirming the denial of Tesla UT's application for a new motor vehicle license.

¶3　This is a narrow, legal decision. We are not opining on broad policy questions presented at some length by Tesla UT in its briefing—on whether Utahns would be better off with direct access to the innovative vehicles offered by Tesla, or whether Tesla's "direct sales" marketing scheme improves the car-buying experience. These questions are not ours to answer, as we interpret the governing statutes to control this case and find no constitutional barrier to their implementation.

¶4　We likewise stop short of deciding whether Tesla itself (the manufacturer) is barred from obtaining its own license to sell new motor vehicles. Tesla UT alludes to that question repeatedly in its briefing. But that question is not at issue because Tesla never submitted its own application and is not a party to this case. For reasons presumably important to Tesla, the automobile manufacturer chose to create a subsidiary entity and directed the subsidiary to submit a license application. For that reason, we are ruling only on Tesla UT's right to obtain a new vehicle dealer license as the wholly owned subsidiary of Tesla. We express no opinion on whether a motor vehicle manufacturer is barred from securing its own license to sell its own motor vehicles.

## I.　BACKGROUND

¶5　On February 12, 2015, Tesla UT applied for a license to sell new Tesla vehicles at a physical store in Salt Lake City. The application was denied by the Motor Vehicle Enforcement Division on the ground that Tesla UT did not have a "franchise" to sell Tesla vehicles as required by the Licensing Act. Tesla UT responded by

entering into a "dealer agreement" with Tesla. The agreement authorized Tesla UT to sell new Tesla vehicles. But the agreement also purported to avoid creating a franchisor-franchisee relationship under the Franchise Act and prohibited Tesla UT from using Tesla's trademark and trade name.

¶6 With the dealer agreement in hand, Tesla UT reapplied for a new vehicle dealer license. Again the administrator denied the application. He determined that Tesla UT either failed to have a franchise as required by section 41-3-210(g) of the Licensing Act or had an impermissible subsidiary relationship with its franchisor as prohibited by section 13-14-201(1)(u) of the Franchise Act.

¶7 Tesla UT appealed to the Utah Tax Commission, challenging the Division's interpretation of the governing statutes and also asserting a series of constitutional claims. The Tax Commission affirmed. It concluded that the Division had correctly interpreted and applied the statutes, while declining to rule on any of Tesla UT's constitutional claims (given that it lacks jurisdiction to do so. *See* Appellant's Brief, Addendum E, at 17 (citing *Nebeker v. Utah State Tax Comm'n*, 2001 UT 74, ¶ 18, 34 P.3d 180)). The Tax Commission's decision was rooted in section 201(1)(u) of the Franchise Act. In the commission's view, the Tesla entities were at odds with section 201(1)(u) of the Franchise Act because Tesla UT was Tesla's "franchisee" and a new vehicle dealer and Tesla was a "franchisor" that had an ownership interest in the new vehicle dealer.

¶8 Tesla UT now petitions this court for review of the Tax Commission's decision, challenging the decision on statutory and constitutional grounds. Tesla UT's claims raise questions of law, which we review *de novo*. *See Hughes Gen. Contractors, Inc. v. Utah Labor Comm'n*, 2014 UT 3, ¶ 25, 322 P.3d 712.

## II. STATUTORY CLAIMS

¶9 Tesla UT's statutory claims implicate the Licensing Act and the Franchise Act. The Licensing Act governs the issuance of a "new motor vehicle dealer's license." UTAH CODE § 41-3-202(1)(a). Such a license confers the right to "offer for sale, sell, or exchange new motor vehicles." *Id.* By statute, the Motor Vehicle Division's administrator has the authority to decide whether an applicant is "qualified" to receive such a license. *Id.* § 41-3-209(1). In exercising that authority, the administrator is governed by the terms of the Licensing Act. The Act, among other things, spells out grounds that constitute "[r]easonable cause" for the denial of a license application.

*Id.* § 41-3-209(2)(c). And those grounds include "a violation of any state or federal law involving motor vehicles." *Id.* § 41-3-209(2)(c)(vii).

¶10 The Licensing Act itself sets forth certain restrictions on the use of a "license issued under this chapter." *Id.* § 41-3-210(1). One of those restrictions is a proviso that a license holder may not "engage in a business respecting the selling or exchanging of new or new and used motor vehicles for which he is not licensed, including selling or exchanging a new motor vehicle for which the licensee does not have a franchise." *Id.* § 41-3-210(1)(g).

¶11 The above provisions formed the basis for the initial denial of Tesla UT's license application. In denying the first application, the administrator concluded that Tesla UT was in "violation" of a state law "involving motor vehicles" because Tesla UT proposed to sell new motor vehicles for which it did not have a "franchise," as required under section 210(1)(g). Tesla UT responded by entering into a "dealer agreement" with Tesla. And Tesla UT then submitted a new application for a new motor vehicle license.

¶12 That is where the Franchise Act came into play. In enacting the Franchise Act, the legislature found that "[t]he distribution and sales of new motor vehicles through franchise arrangements in the state vitally affects the general economy of the state, the public interest, and the public welfare." *Id.* § 13-14-101(2)(a). And in furtherance of those interests, the legislature deemed it "necessary to establish statutory guidelines regulating the relationship between franchisors and franchisees in the motor vehicle industry." *Id.* § 13-14-101(c). One of the restrictions set forth by statute is a prohibition on a "franchisor" "directly or indirectly" "own[ing] an interest in a new motor vehicle dealer or dealership." *Id.* § 13-14-201(1)(u).

¶13 This provision formed the basis of the denial of Tesla UT's second application for a new motor vehicle license. In denying that application, the administrator noted that if Tesla UT had a franchise with Tesla, then it ran afoul of the prohibition on a franchisor "own[ing] an interest in a new motor vehicle dealer or dealership." *Id.* Alternatively, if there was no franchise relationship between Tesla UT and Tesla, the administrator stated that Tesla UT would fall back into trouble under the Licensing Act—on the ground that it lacked the "franchise" required by Utah Code section 41-3-210(g).

¶14 The Tax Commission's decision embraced the administrator's understanding of the two acts. It noted Tesla UT's

position that its dealership agreement with Tesla "provides it adequate authorization to sell Tesla vehicles and meets the requirements of being a franchise under" the Licensing Act. But it concluded that Tesla UT was not qualified to receive a license because Tesla was a "franchisor" under the Franchise Act and held an ownership interest in Tesla UT as a "new motor vehicle dealer" that was prohibited by section 13-14-201(1)(u) of that statute.

¶15 These conclusions reflect the "dilemma of franchise terms" identified by the Attorney General's office in a filing opposing the Tesla UT application. In the Attorney General's office's view, Tesla UT was caught between the rock of the Licensing Act and the hard place of the Franchise Act: Either Tesla UT lacked the "franchise" with Tesla required by the Licensing Act, *id.* § 41-3-210(1)(g), or its "franchise" put it at odds with the Franchise Act's prohibition on a franchisor's ownership of an "interest" in a new motor vehicle dealer, *id.* § 13-14-201(1)(u).

¶16 The tension between the Licensing Act and the Franchise Act is at the forefront of the parties' briefing in this case. Tesla UT insists that its dealer agreement satisfies the "franchise" requirement of the Licensing Act but did not amount to a "franchise" under the Franchise Act. It also argues, in the alternative, that the Motor Vehicle Division had no statutory authority to consider any alleged violation of the Franchise Act in evaluating Tesla UT's eligibility for a new motor vehicle license.

¶17 The Tax Commission, on the other hand, seeks to conflate the two statutory notions of "franchise." Its principal position on appeal is that the dealer agreement established a "franchise" under the Franchise Act and that Tesla's ownership of Tesla UT as a subsidiary runs afoul of the Franchise Act. The commission also defends the Motor Vehicle Division administrator's statutory authority to take violations of the Franchise Act into account in ruling on an applicant's qualification to secure a license. And it argues, in the alternative, that if Tesla UT does not have a "franchise" under the Franchise Act then it must necessarily be in violation of the Licensing Act's requirement that a license holder have a "franchise" for the sale of new motor vehicles. *See id.* § 41-3-210(1)(g).

¶18 We reject the Tax Commission's conception of a unitary notion of "franchise" under the Licensing Act and the Franchise Act but nonetheless affirm the decision denying Tesla UT's application. First, we conclude that Tesla UT's relationship with Tesla amounts to a "franchise" under the Licensing Act. Second, we explain that the

notion of "franchise" under the Franchise Act is different, but hold that Tesla UT's arrangement with Tesla also qualifies as a "franchise" under that statute. Finally, we reject Tesla UT's assertion that the Motor Vehicle Division lacks statutory authority to consider a violation of the Franchise Act in deciding whether an applicant is qualified to receive a license.

## A. Licensing Act

¶19 The Licensing Act prohibits the holder of a license from "engag[ing] in a business respecting the selling or exchanging of new . . . motor vehicles for which he is not licensed, including selling or exchanging a new motor vehicle for which the licensee does not have a franchise." UTAH CODE § 41-3-210(1)(g). Tesla UT's initial application for a license was denied on the ground that it lacked the required "franchise." And Tesla UT responded by entering into a formal dealer agreement with its parent.

¶20 The threshold question presented is whether Tesla UT has a "franchise" sufficient to satisfy the Licensing Act. We conclude that it does. "Franchise" is a defined term under the Licensing Act. Under this statute, a "franchise" is simply "a contract or agreement between a dealer and a manufacturer of new motor vehicles or its distributor or factory branch by which the dealer is authorized to sell any specified make or makes of new motor vehicles." *Id.* § 41-3-102(16). Tesla UT unquestionably has a "contract or agreement" with a manufacturer by which it is "authorized to sell" Tesla cars. The dealer agreement with Tesla makes that clear—even if it wasn't already clear prior to the execution of that contract.

## B. Franchise Act

¶21 The Tax Commission does not really contest the above conclusion under the Licensing Act's definition of "franchise." Instead it falls back on the horns of the "dilemma" noted above. It asserts that either Tesla UT's "franchise" with Tesla is barred by the terms of the Franchise Act (due to the parent-subsidiary relationship between the two entities), or if there is no "franchise," then Tesla UT must be barred by the terms of the Licensing Act. This implicates the "unitary franchise" theory advanced by the Tax Commission—the view that a franchise under one statute must constitute a franchise under all others, and thus that Tesla UT is damned (by the Franchise Act) if it has a franchise and damned (by the Licensing Act) if it doesn't.

¶22 We reject the Tax Commission's theory because we find it incompatible with the terms of the governing statutes. We see two distinct notions of "franchise" in these two statutory schemes and thus room for the conclusion that a prospective new vehicle dealer could have a "franchise" for Licensing Act purposes but no "franchise" under the Franchise Act. Ultimately, however, we conclude that Tesla UT's arrangement with its parent corporation established a "franchise" under both schemes, and thus that Tesla UT is at odds with the Franchise Act.

¶23 The legislature is undoubtedly empowered to define "franchise" in different ways in different statutory schemes. And where it has done so we are bound by the statutory definitions—and not by our judicial preference for linguistic consistency. *See In re Estate of Hannifin,* 2013 UT 46, ¶ 20 n.7, 311 P.3d 1016 ("Because the statute . . . provides these definitions, we [cannot] define those [terms] as we see fit."); *see also Pac. Intermountain Express Co. v. State Tax Comm'n of Utah*, 329 P.2d 650, 652 (Utah 1958) (noting "that definitions in unrelated statutes do not necessarily determine" the meaning of the same term in the pertinent statute).

¶24 As noted above, the Licensing Act notion of "franchise" is straightforward—any "contract or agreement" authorizing the sale of new motor vehicles establishes a "franchise" for purposes of the Licensing Act. UTAH CODE § 41-3-102(16). Yet the Franchise Act requires more than that. A "franchise" exists under the Franchise Act only if there is a written agreement or "course of dealing or a practice" in which "(i) a person grants to another person a license to use a trade name, trademark, service mark, or related characteristic; and (ii) a community of interest exists in the marketing of new motor vehicles, new motor vehicle parts, and services related to the sale or lease of new motor vehicles at wholesale or retail." *Id.* § 13-14-102(8)(a). One could certainly have a franchise under the Licensing Act but no franchise under the Franchise Act.

¶25 Yet we nonetheless affirm the Tax Commission's determination that Tesla UT has a "franchise" arrangement with Tesla for purposes of the Franchise Act. First we conclude that Tesla has granted to Tesla UT a "license" to use Tesla trademarks. Then we explain the basis for our conclusion that there is a "community of interest" between the two entities under the statute. And we conclude by rejecting Tesla UT's attempts to avoid the clear import of the plain text of the statute by reference to its supposed "purpose."

1. Franchise

¶26 The first element of a "franchise" under the Franchise Act is a grant of a "license to use a trade name, trademark, service mark, or related characteristic." *Id.* § 13-14-102(8)(a)(i). Tesla UT insists that this element is lacking because the dealer agreement purports to disclaim the grant of a trademark license. Yet the question presented is not limited to the bare terms of the dealer agreement. The Franchise Act may not be circumvented by empty words of disclaimer. If Tesla has in fact granted Tesla UT the right to use Tesla trademarks in operating a dealership in Utah, then we must conclude that this element of a "franchise" is met.

¶27 And we do so conclude. We find the practical reality of the relationship between Tesla and Tesla UT impossible to reconcile with the dealer agreement's purported disclaimer of a grant of a trademark license. Even at this early stage, Tesla UT's use and anticipated use of Tesla trademarks is evident. As the Tax Commission noted, the "principal place of business" identified in the dealer agreement for Tesla UT is "2312 South State Street, South Salt Lake City, Utah 84115." And "[t]he Tesla name and logo are on the building at 2312 South State Street." That building, moreover, is the location for which Tesla UT submitted its license application to the Utah Motor Vehicle Division. So it is quite apparent that Tesla UT's operation of a dealership is to involve the use of Tesla trademarks. And Tesla has hardly objected; indeed it has given its open support for this use and has even directed it.[1]

¶28 Tesla UT does not meaningfully contest the above. Instead it hangs its hat on the statutory proviso that a "franchise" exists only where the franchisor "grants" the trademark license to the franchisee. UTAH CODE § 13-14-102(8). And it insists that there was no "grant" here because the license agreement disclaims it and any

---

[1] Ongoing—and even more extensive—trademark use seems inevitable. A dealer can hardly engage in the operation of a car dealership without further trademark use—on business cards, stationery, and further signage. And although there is as yet no evidence of such use in this record, it seems impossible to believe that such use is not in fact anticipated. We could remand for findings on this question if we deemed it necessary to our decision. But we affirm without a remand because we find other evidence of a grant of trademark rights in the record as it now stands.

rights conferred on Tesla UT accrued "automatically" by virtue of its status as a wholly owned subsidiary.

¶29 We find no logical or legal basis for this argument. As for logic, either Tesla UT has permission to use the Tesla trademarks or it doesn't. And if it does, it is because those rights were *granted* by the owner of the trademark (Tesla), and not because a subsidiary "automatically" acquires trademark rights. Surely Tesla could establish a subsidiary to which it withholds trademark use rights. So the fact that Tesla UT has such rights means that it has been *granted* them by Tesla.

¶30 Legally, it matters not that Tesla UT's trademark license was not granted in a written dealer agreement. By statute, the trademark license may be granted through a "course of dealing or a practice" between the entities. *Id.* And that is what occurred here.

¶31 At oral argument in this court, Tesla UT sought to obviate the existence of a grant of trademark rights by invoking the principle that "[t]hose who resell genuine trademarked products are generally not liable for trademark infringement." *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1071 (10th Cir. 2009). Fair enough. A purchaser of a Tesla vehicle has the right to resell it without a trademark license. And if Tesla UT were in that position it could resell Tesla cars without a license. Thus, if Tesla UT were planning only to resell genuine Tesla vehicles—*without* holding itself out as a Tesla affiliate by use of Tesla trademarks—it could do so without a trademark license. But Tesla UT, as noted, is not anticipating that kind of business. It has applied for a license to sell cars from a storefront that bears the Tesla trademark on its signage. And that is classic trademark use.[2]

¶32 Tesla UT's arrangement with Tesla accordingly involves at least an implied trademark license.[3] The license appears to be

---

[2] *See, e.g., Audi AG v. D'Amato*, 469 F.3d 534 (6th Cir. 2006); *Harley-Davidson, Inc. v. Grottanelli*, 164 F.3d 806 (2d Cir. 1999); *Porsche Cars N.A. v. Manny's Porshop, Inc.*, 972 F. Supp. 1128 (N.D. Ill. 1997).

[3] *See Menendez v. Holt*, 128 U.S. 514, 524 (1888) ("Where consent by the owner to the use of his trade-mark by another is to be inferred from his knowledge and silence merely, it lasts no longer than the silence from which it springs. It is, in reality, no more than a revocable license." (internal quotation marks omitted)); *see also Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1516 (11th Cir. 1984)

(continued . . .)

revocable. But it clearly has been *granted* by Tesla in anticipation of the operation of the dealership that is the subject of the dealer agreement. And that is sufficient to satisfy the first element of a "franchise" under the Franchise Act.

## 2. Community of Interest

¶33   The second element of a "franchise" is a "community of interest . . . in the marketing of new motor vehicles, new motor vehicle parts, and services related to the sale or lease of new motor vehicles at wholesale or retail." *Id.*   § 13-14-102(8)(a)(ii). Tesla UT sought to contest this element at oral argument in this court by asserting that the *identity* of interest between Tesla UT and its parent is somehow too close to count as a *community* of interest. Tesla UT's point is apparently that a "community" involves a group of persons or entities that are disparate to some degree but unified in other relevant ways.

¶34   We find no room for Tesla UT's position in the language of the statute. A "community" is a "unified body of individuals," a "group linked by a common policy," or a "body of persons or nations having a common history or common social, economic, and political interests." *Community*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003). The members of a community admittedly must be distinct individuals or entities. But the core characteristic of a "community" is in their *unity*—under the statute, unity as to the "interest . . . in the marketing of new motor vehicles, new motor vehicle parts, and services related to the sale or lease of new motor vehicles at wholesale or retail." UTAH CODE § 13-14-102(8)(a)(ii). And here there is both distinctness and unity: Tesla UT and Tesla are distinct corporate entities, and their unity could not be clearer with respect to their interest in selling Tesla cars.

¶35   Tesla UT's argument on this point is procedurally barred in any event, as it was not presented in the briefs but was first raised at oral argument. *See Anderson v. Bell*, 2010 UT 47, ¶ 7, 234 P.3d 1147. We accordingly hold that the second element of a "franchise" under the Franchise Act is satisfied here, and thus that Tesla UT is subject to the statutory bar on a "franchisor" "directly or indirectly" "own[ing] an interest in a new motor vehicle dealer or dealership." UTAH CODE § 13-14-201(1)(u).

---

("Acquiescence alone is analogous to an implied license to use the name.").

¶36 In so concluding we stop short of addressing an alternative point advanced by the Tax Commission—that the operative prohibition in the statute speaks to only the relationship between a "franchisor" and a "new motor vehicle dealer," *see id.*, and that Tesla is acting as a "franchisor" even if it is not operating a "franchise." That may be right under the plain language of the statute. Certainly Tesla meets the elements of "franchisor."[4] And the operative prohibition in the statute speaks only to the relationship between a "franchisor" and a "new motor vehicle dealer," without any express reference to a "franchise." *Id.* But we need not resolve this question here because we conclude that Tesla also has a "franchise" relationship with Tesla UT. And on that basis we find a violation of the statutory bar on a "franchisor" "directly or indirectly" "own[ing] an interest in a new motor vehicle dealer or dealership." *Id.*

### 3. The "Purpose" of the Franchise Act

¶37 Tesla UT seeks to obviate the terms of the Franchise Act by reference to its avowed "purpose." That purpose, as Tesla UT sees it, is to protect dealers against the unequal bargaining power of automobile manufacturers. And in Tesla UT's view that purpose is not implicated by the relationship between a manufacturer and its wholly owned subsidiary—a point that Tesla UT advances by insisting that some of the operative terms of the Franchise Act would be inapplicable in the parent-subsidiary context.

¶38 This argument is flawed in its threshold premise. The breadth and reach of our laws are measured by the *words* that were voted on by the legislature and signed into law by the governor—not by the general function or *purpose* we may ascribe to the law in retrospect.[5] This is a proposition with both legal and practical

---

[4] *See* UTAH CODE § 13-14-102(10) (defining "franchisor" as a "person," including a "manufacturer" of "new motor vehicles," who "permits a franchisee to purchase, sell, or offer for sale new motor vehicles manufactured . . . by the franchisor"); *id.* § 13-14-102(9) (defining "franchisee" as a "person with whom a franchisor has . . . permitted . . . to purchase, sell, or offer for sale new motor vehicles manufactured . . . by the franchisor").

[5] *See Craig v. Provo City*, 2016 UT 40, ¶ 31, 389 P.3d 423 ("[A] court cannot reliably discern legislative intent on a particular matter by reasoning generally from a statement (even an accurate one) of a broad statutory purpose.").

footings. The legal basis is in the Utah Constitution. Articles VI and VII of that document provide that legislation becomes law upon approval by a majority of both houses of the legislature and a signature by the governor (or a super-majority override of an executive veto). *See* UTAH CONST. art. VI, § 22; *id.* art. VII, § 8. As a matter of state constitutional law, then, the law consists of the text that is voted upon and presented to the governor. We may have a sense of the motivating consideration or "purpose" of a legislative enactment, but our sense of such purpose is not law; it is at most an aid in resolving ambiguities in the law.[6]

¶39   This conclusion also finds footing in practical grounds. Hardly any statute is enacted for only one purpose. Most all of our laws are aimed at balancing competing purposes, not at advancing one at all costs.[7] And for that reason, a myopic focus on one perceived purpose is likely to upset the precise balance — the legislative compromise — enacted into law by the legislature.[8]

¶40   That problem is evident in Tesla UT's view of the Franchise Act. That statute is undoubtedly aimed in part at protecting franchisees (dealers) from franchisors (manufacturers). But we cannot say that that is the statute's only purpose. Surely it is also aimed at delineating the respective responsibilities of franchisees and franchisors, and at protecting the latter to some degree.

---

[6] *See VCS, Inc. v. Utah Cmty. Bank*, 2012 UT 89, ¶ 23, 293 P.3d 290 ("Our understanding of purpose, in other words, can be employed to inform and resolve ambiguities in the text; it cannot be used to establish an ambiguity that does not exist, or to override the meaning of a statute that is otherwise plain.").

[7] *See Myers v. Myers*, 2011 UT 65, ¶ 27, 266 P.3d 806 ("Legislation is rarely aimed at advancing a single objective at the expense of all others."); *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 23 n.6, 248 P.3d 465 ("[M]ost statutes represent a compromise of purposes advanced by competing interest groups, not an unmitigated attempt to stamp out a particular evil.").

[8] *See* Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 HARV. J.L. & PUB. POL'Y 61, 68 (1994) (explaining that, for this reason, a decision allowing a vague statutory purpose to override the compromise reflected in the text "dishonors the legislative choice as effectively as expressly refusing to follow the law").

¶41 Section 13-14-205 is a good example. This provision allocates liability between a franchisor and franchisee for damages to a car during transit. Under section 205, a "franchisee is solely liable for damage to a new motor vehicle after delivery by and acceptance from the carrier." UTAH CODE § 13-14-205(1)(a). That provision can easily apply to a franchise involving a parent and subsidiary. It insulates the parent (manufacturer) from liability for damages incurred after acceptance, channeling all liability to the subsidiary (dealer).

¶42 Provisions like this foreclose the conclusion that the Franchise Act has no salience as applied to a parent and subsidiary. They also indicate that the statute is aimed at protecting both franchisees and franchisors to some degree. Tesla undoubtedly had its reasons for establishing a separate subsidiary entity—and for submitting the new dealer license application in the name of that subsidiary. Presumably one of the key reasons was to limit the liability of the parent-manufacturer. And the Franchise Act provides such protection to the manufacturer—delineating the line between franchisor liability and franchisee liability.

¶43 The statute says what it says. It expressly bars a franchisor from having an ownership interest in a new motor vehicle dealer. And we cannot override that clear prohibition by a vague sense of overarching statutory purpose.

## C. The Motor Vehicle Division's Authority

¶44 Tesla UT's final attempt to avoid the Franchise Act's prohibition on a manufacturer's ownership interest in a dealer is its assertion that the Motor Vehicle Division lacked the legal authority to look to that statute in making licensing decisions. The principal basis for this argument is Utah Code sections 13-14-106 & -107. Those provisions assign to the Department of Commerce the responsibility of investigating and imposing sanctions for violations of the Franchise Act. And if the Motor Vehicle Division were engaged in that kind of activity—investigating and imposing sanctions for Franchise Act violations—then Tesla UT might be right to challenge the Division's authority.

¶45 But that is not what the Motor Vehicle Division was up to. It was performing its responsibility to receive and act upon an application for a new motor vehicle dealer license. And in fulfilling that responsibility, the Division is required to deny a license where there is "a violation of any state or federal law involving motor vehicles." UTAH CODE § 41-3-209(2)(c)(vii).

¶46　To assist the Division in this and other determinations, the administrator is authorized to "require information from the applicant concerning the applicant's fitness to be licensed." *Id.* § 41-3-105(4)(b). And the Division is likewise empowered to use the information provided by an applicant to determine the applicant's fitness. That is all that happened here. In response to a standard inquiry from the administrator, Tesla UT disclosed that it is wholly owned by Tesla. And the administrator, in turn, decided that Tesla UT was ineligible for a license because it was in "violation" of a "state . . . law involving motor vehicles," *id.* § 41-3-209(2)(c)(vii)—the bar on "franchisor" ownership of a new motor vehicle dealer in section 201(1)(u) of the New Automobile Franchise Act.

¶47　We see no reason to conclude that the administrator exceeded his authority. He in no way stepped into the Department of Commerce's role—of conducting an independent investigation or imposing a sanction under the Franchise Act. He was simply doing his job—of acting on a license application based on considerations dictated by statute.

¶48　For these reasons, we affirm the Tax Commission's decision under the terms of the operative statutes. We find the text of these provisions to sustain the denial of Tesla UT's application, and we see no basis for overriding the statutory language.

## III.　CONSTITUTIONAL CLAIMS

¶49　Tesla UT's constitutional claims are threefold. Tesla UT challenges the constitutionality of the bar on a motor vehicle manufacturer's ownership interest in a new motor vehicle dealer under the Free Market Clause of the Utah Constitution, the Due Process and Equal Protection Clauses of the United States Constitution, and the so-called "dormant" Commerce Clause of the United States Constitution.

¶50　We find no merit in any of these claims. And we accordingly uphold the constitutionality of the statutory bar on a motor vehicle franchisor's ownership of an interest in a new motor vehicle dealer.

### A.　Free Market Clause

¶51　Tesla UT first invokes the so-called Free Market Clause of the Utah Constitution. Utah Const. art. XII, § 20. This provision states that "[i]t is the policy of the state of Utah that a free market

14

system shall govern trade and commerce in this state to promote the dispersion of economic and political power and the general welfare of all the people." Tesla UT views this statement as a constitutional barrier to the statutory prohibition on a motor vehicle franchisor's ownership of an interest in a new motor vehicle dealer. We disagree.

¶52 Not every provision of the constitution states an enforceable limitation on our government. Some provisions are non-justiciable: They are stated at so high a level of generality or aspiration that they require legislation to establish a limitation enforceable in our courts. *See Bott v. DeLand*, 922 P.2d 732, 737 (Utah 1996) (noting that "constitutional provisions are not self-executing if they merely indicate a general principle or line of policy without supplying the means for putting them into effect"), *abrogated on other grounds by Spackman v. Bd. of Educ. of Box Elder Cty. Sch. Dist.*, 2000 UT 87, 16 P.3d 533.

¶53 The quoted language of the Free Market Clause is such a provision. This clause articulates only a "policy." And it frames the policy in terms that identify only a "general principle" with no justiciable standard or "means for putting [it] into effect." *Id.* We know from the Free Market Clause that our charter for state government is in favor of a "free market." But we know little more than that.

¶54 The general aspiration for a "free market" is too vague a policy to sustain a justiciable constitutional standard. So without any implementing legislation, we deem this provision non-justiciable. We reject this claim on that basis.

B. Equal Protection and Due Process

¶55 Tesla UT next turns to the Equal Protection and Due Process Clauses of the Utah and United States constitutions. The basis for this claim is the assertion that Tesla UT has been denied a property interest (in selling cars) on a discriminatory basis. Tesla UT claims that similarly situated dealers are granted a new motor vehicle license. And it asserts that the State has no legitimate ground for denying Tesla UT a license on the basis of its subsidiary relationship with Tesla. Again we disagree.

¶56 As an initial matter, we note that Tesla UT has not briefed its state constitutional claims "as an issue separate and distinct from [their] federal counterpart[s]." *State v. Rynhart*, 2005 UT 84, ¶ 12, 125 P.3d 938. We accordingly proceed under solely a federal constitutional standard. *Id.*

¶57 And we find no merit in these claims. The applicable standard of scrutiny is rational basis review. Because there is no suspect classification at work under the Licensing Act and Franchise Act, the law "need only be rationally related to a legitimate government purpose." *See Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002). This holds "even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *Romer v. Evans*, 517 U.S. 620, 632 (1996). The legislature may draw lines that the judiciary views as curious or even unwise. But unless those lines are utterly lacking in a rational basis, we judges have no say in the matter; we leave the second-guessing to the political branches of government.

¶58 And here we find nothing irrational about the line drawn by the legislature. An apparent purpose of the operative statutes is the protection of consumers from sharp or fraudulent new motor vehicle sales practices. That purpose, moreover, may be thought to be advanced by a statutory prohibition on a car manufacturer's ownership of a dealer—as the independence of a dealer may rationally be expected to protect the consumer from sharp or fraudulent practices. Our law ensures the existence of two independent entities (a manufacturer and a dealer) with incentives to satisfy the needs of the consumer. And the legislature's thinking—which we can hardly call irrational—is that consumers are better protected by an independent dealer than they would be by a dealer owned by the manufacturer.

¶59 That is sufficient to sustain the constitutionality of the statutory scheme at issue under rational basis review. We reject Tesla UT's equal protection and due process claims on that basis.

## C. Dormant Commerce Clause

¶60 Tesla UT lastly turns to the "dormant" Commerce Clause. It asserts that the statutory scheme places a burden on interstate commerce that is "excessive" in relation to the putative local benefits. This claim invokes the standard from *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970): "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.* at 142.

¶61 Yet Tesla UT does little to support the applicability of this test in a case like this one, and nothing to establish the precise nature

of the standard of scrutiny. Tesla UT's claim implicates some difficult, unresolved questions under the dormant Commerce Clause—whether *Pike* balancing applies in a case like this one,[9] and what sort of deference is given to purported governmental interests.[10] Instead it treats *Pike* as an alternative formulation of the

---

[9] We have precious little guidance from the U.S. Supreme Court on the domain of *Pike* balancing. *See* Brannon P. Denning, *Reconstructing the Dormant Commerce Clause Doctrine*, 50 WM. & MARY L. REV. 417, 456 (2008) (noting "that the Court has not invalidated a state or local law under balancing since Justice Scalia has been on the Court"); Daniel K. Lee & Timothy P. Duane, *Putting the Dormant Commerce Clause Back to Sleep: Adapting the Doctrine to Support State Renewable Portfolio Standards*, 43 ENVTL. L. 295, 309 (2013) ("[T]he Court has continually broadened the concept of discrimination over the years, which has allowed it to apply strict scrutiny more liberally to state regulation while diminishing the application of the *Pike* test."). The court has openly acknowledged that "there is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986). So it is no surprise that there is a split among federal circuit courts on the question of when the *Pike* test is triggered. *See Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1132 (7th Cir. 1995) (declining to apply *Pike* in cases where the statute does not discriminate against out-of-state businesses "in either terms or effect"); *U & I Sanitation v. City of Columbus*, 205 F.3d 1063, 1065 (8th Cir. 2000) (implicitly holding that *Pike* applies even when there is no discrimination against out-of-state businesses; invalidating a local ordinance that burdened only purely intrastate activities).

[10] *See* James D. Fox, Note, *State Benefits Under the Pike Balancing Test of the Dormant Commerce Clause: Putative or Actual?*, 1 AVE MARIA L. REV. 175, 177 (2003) ("The law is unsettled though, and the legal standard to be applied to the state benefits side of the *Pike* balancing scale is amorphous at best, resulting in unacknowledged splits between the courts of appeals."). Some circuits have applied a rational basis test. *See Alaska Airlines, Inc. v. City of Long Beach*, 951 F.2d 977, 984 (9th Cir. 1991), *as amended on denial of reh'g* (Jan. 9, 1992) (declining to undertake *Pike* balancing and ruling that a non-discriminatory "ordinance would violate the commerce clause only if the particular means chosen to achieve its goals were irrational, arbitrary or unrelated to those goals."); *Ford Motor Co. v. Texas Dep't*

(continued . . .)

rational basis standard set forth above. It acknowledges that the state has a "legitimate governmental interest in regulating the relationship between car manufacturers and their independent franchised dealers," but insists that such "interest is not furthered by the denial of Tesla's license since Tesla does not franchise," and thus that there is "no evidence that [the] denial of Tesla's license advanced any legitimate government interest at all."

¶62   We reject this argument on its terms—without reaching the broader questions implicated but not addressed in the briefing in this case (concerning the applicability of the *Pike* test in this case and the difference, if any, between the rational basis test and the balancing test called for under *Pike*). Tesla UT's argument appears to have two components: (a) the assertion that the state's interest in regulating the franchise relationship is not implicated because Tesla is not operating an independent franchise; and (b) the allegation that the State has not shown that the denial of a license to Tesla UT advances any of the State's admitted interests. Yet both assertions fail for reasons set forth above. The first point fails on the statutory grounds for our decision—that Tesla is operating a franchise under the terms of both the Licensing Act and the Franchise Act. *See supra* ¶¶ 18, 24–25. And the second point overlaps precisely with—and thus fails for reasons noted in the context of—our rational basis analysis. *See supra* ¶¶ 57–59. We reject this claim on these grounds.

¶63   In so doing we are not concluding that *Pike* is necessarily implicated in a case like this one, or that the balancing standard we apply here is the correct one. Our point is simply that Tesla UT's dormant commerce arguments overlap completely with points raised elsewhere in its briefing. Thus, we reject this claim for reasons

---

*of Transp.*, 264 F.3d 493, 504 (5th Cir. 2001) (ruling that the plaintiff "failed to carry its burden of proving that 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits'" where "the evidence is not so one-sided as to lead this Court to believe that the proffered state interests are an excuse to discriminate against or burden interstate commerce for the benefit of local industry"). But others have required something more. *See Ass'n of Int'l Auto. Mfrs., Inc. v. Abrams*, 84 F.3d 602, 612 (2d Cir. 1996) (remanding a case on *Pike* grounds, in part because the legislative reasoning behind the relevant statute was "debatable").

stated elsewhere in our opinion, while emphasizing that it is not our role to engage in further research or analysis on behalf of a litigant.[11]

## IV.    CONCLUSION

¶64    The Utah Legislature has enacted statutes prohibiting a subsidiary of a motor vehicle manufacturer from obtaining a license to sell the manufacturer's new motor vehicles in stores in Utah. We give effect to those statutes today while also upholding them against constitutional attack. And we therefore affirm the denial of a new motor vehicle license to Tesla UT.

─────────────

[11] *See State v. Thomas*, 961 P.2d 299, 305 (Utah 1998) ("While failure to cite to pertinent authority may not always render an issue inadequately briefed, it does so when the overall analysis of the issue is so lacking as to shift the burden of research and argument to the reviewing court.").